## Denham v. Commonwealth.

(Decided June 19, 1931.)

772

B. F. DENHAM and HEBRON LAWRENCE for appellant.

J. W. CAMMACK, Attorney General, and JAS. M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

Since the judgment sentencing the appellant to imprisonment for life for the murder of the bastard baby of his daughter must be reversed because of failure of proof, it is necessary to state the evidence in some detail. The daughter, who was jointly tried with the appellant, was found not guilty.

Before considering the merits of the case, disposition must be made of the motion of the commonwealth to strike the bill of exceptions from the record because of tardiness in filing it in the lower court. On August 30, 1930, the defendant was given sixty days from the date to prepare and tender the bill and transcript of the evidence. The time being about to expire, on October 29th the commonwealth's attorney and counsel for the defendant signed an agreement extending the time until the third day of the ensuing December term of court, and stipulating that an order might be entered to that effect. On that day the judge approved the transcript as a bill of exceptions and it was duly filed. Section 334 of the Civil Code of Practice, as amended by Acts 1930, c. 19, controls the filing of such record (Criminal Code of Practice, sec. 282), and it has often been interpreted that the bill must be filed within the time allowed, or before that period expired an extension must have been granted.

The extension agreed upon appears to have been within proper time and no objection was entered to the filing and approval of the bill in accordance with it. It has been several times held that timely agreements in civil cases in such matters are binding. Meagher v. Bowling, 107 Ky. 412, 54 S. W. 170, 21 Ky. Law Rep. 1149; Hill's Adm'r v. Penn Mutual Life Insurance Company, 120 Ky. 190, 85 S. W. 759, 27 Ky. Law Rep. 567; Vertrees v. Head, 138 Ky. 83, 127 S. W. 523; Sandy Valley & Elkhorn Ry. v. Bentley, 175 Ky. 736, 194 S. W. 906. The commonwealth, no more than a civil litigant, will be permitted through its authorized officer to make an agreement with a defendant whose life or liberty is jeopardized, and later repudiate it. The motion is overruled.

The wife of the appellant, a man in humble circumstances, died in December, 1927, leaving him with the care of seven children, ranging in age from five days to sixteen years. His oldest daughter, in November, 1928, gave premature birth to an illegitimate child, which was born dead, or shortly thereafter died, and was secretly buried by her father.

Several weeks before February 11, 1930, the accused approached Dr. G. E. Bushong, his family physician, and told him that his daughter was with child and engaged him to attend her when needed. He asked the doctor not to say anything about it. On that night the doctor was called and attended the girl when she gave birth to a normally developed child. He testified that immediately thereafter the girl said two or three times, "Let it die," and that the accused said, "Do you or don't you suggest that," or something of the kind, and the doctor responded: "No, I don't; if you want it to die do it yourself." On cross-examination he stated that he could be mistaken about what she said. He was asked if she didn't say, "Let me die; can't you let me die?" And answered that he understood her to say, "Let it die." He had administered some medicine to the mother in travail, which made her suffering more acute but which caused it to sooner subside, and stated that she was suffering a great deal at the time and that under such circumstances the patient is not always rational. The girl's sister produced some clothing for the baby, and he instructed her how to wash and dress it, which she did. He left after a time, declining the invitation of the appellant to remain the rest of the night. He made

no examination of the child before he left, supposing that it was all right. The next morning appellant came to him and asked if he had seen anything wrong with the baby, and he told him he had not. He then told the doctor that the baby was dead; that when he had started to give his daughter the medicine which had been left he found the baby was dead. He asked the doctor not to say anything about it.

It appears that some gossip became current in the neighborhood as to the birth of the child, and the appellant went about vigorously denying that fact and undertaking to quiet the talk. Officers of the law took cognizance of the rumor and seem to have interrogated the girl and her father, both of whom continued to deny that there had been any child born in the home. It was finally admitted by the girl, but she steadfastly refused to divulge the name of the father of her child. An aunt, and perhaps other relatives testified that she did admit that her father was responsible for her disgrace.

About three weeks thereafter the defendant was taken from the jail and went with officers to his home, where he voluntarily disclosed the burying place. The body was exhumed and examined by Dr. Bushong and Dr. Duncan. Both physicians say that they could find no signs of violence on the body nor anything to indicate that any violence had been done it or any murder committed; that they could not find anything that caused its death. They testified, however, that it would have been possible for the chlid to have been smothered. These doctors and others gave evidence as to the ratio of deaths of newly born children. Dr. Bushong says that one in every ten died a few hours after birth. The other physicians testified the proportion is less.

Many witnesses were introduced to show that the girl was not permitted to have the company of boys and that wherever she went her father accompanied her, all of which was to show nonaccess by any man other than her own father and thereby to establish his motive for the murder.

The accused admitted the several statements attributed to him with respect to the denial of the birth of the child, all of which, he said, were made in an effort to hide the shame of his daughter and to protect his family. He very vigorously denied the paternity of the child and all suggestion of incest. He stated that he had

been very careful to guard and protect his children because they had no mother to look after them. On one occasion as he was returning home a man, whom he understood was a picture agent, was leaving his home in an automobile and engaged him in conversation.

As to the immediate circumstances he testified that about the time the baby was born he understood his daughter to say, "Let it die," and that he didn't say anything, but the doctor made some statement to the daughter to the effect, "You can kill it yourself," and that he responded, "No, you don't suggest anything like that, do you, Eagle" (the doctor's given name). The child was dressed and put back in the bed with its mother, and after the doctor left he sat down in a chair in the room and went to sleep. The mother wanted to be turned over, and he and his other daughter turned her, which left the baby at her back, and he returned to his chair and the other girl laid down.

About 3 o'clock the mother called him and said she had heard the baby make a noise and to come and turn her over. He went to the bedside and the baby did not look right to him, and he carried it to the light and found upon a close examination that it was dead. He then called his younger daughter. They put the body in a box and concealed it in a wardrobe, and the next night he buried it. The purpose of the concealment and secrecy was an effort to keep his children from knowing about it and others from seeing him. He vigorously denied ever having had his hands on the child until after it was dead, and stated that nobody else killed it.

The mother of the child fully corroborated her father, and was unshaken on cross-examination. She too had denied the birth of the child to the officers and others in order to conceal her shame, and she put a different construction upon the conversation with her aunt and those witnesses who testified that she had admitted that her father was guilty of begetting the child. She testified that while she was being interrogated by the officers, the commonwealth's attorney had insisted that she should admit that he was the father of the child, saying, "You had better tell it and stay out of the electric chair." This was not contradicted by that officer. She testified that a certain named man from Bowling Green, whose business was enlarging pictures, and whom she described, was the father of both of her illegitimate

children, and she went into details as to her relations with him. She had concealed his name because she was in love with him. She had washed and laid away the garments of her baby sister in preparation for the birth of her child.

The testimony of the younger daughter is in accord with that of her father and sister in so far as she had opportunity to know the circumstances.

In rebuttal a number of neighbors were introduced to testify that they never saw or heard of such a man as was described by the daughter and that he had never been in that neighborhood.

Before a man may be convicted of a murder, there must be proof beyond a reasonable doubt that a murder has been committed and that he is guilty of committing it. This is commonly called establishing the corpus delicti. From domestic and foreign cases, Roberson deduces the following well-stated rule in section 1779 of his book on Kentucky Criminal Law and Procedure:

"To sustain the charge of a criminal offense there must be proved: first the corpus delicti, the fact of the crime; and secondly, that the accused committed the offense charged against him. Corpus delicti means the fact that the particular crime alleged has been actually committed by some one, and is made up of two elements: first, the existence of a certain act or result forming the basis of the criminal charge; and, second, the existence of criminal agency as the cause of this act or result. The corpus delicti may be established by circumstantial evidence as any other fact in the case."

The evidence in this case proves that a baby was born and was dead, with an intervening period of life. Motive and opportunity for the defendant to have killed it were amply proven, but there was no evidence that the child was killed and did not die a natural death, nor that this defendant had committed the crime of murder.

Circumstantial evidence which is as consistent with the absence of a crime as with the perpetration of the crime is insufficient to prove the corpus delicti. Underhill Criminal Evidence, sec. 37. The same wise rule applies in respect to the proof of commission of a crime. If the facts proven may be reasonably reconciled with the presumption of innocence of the accused, guilt is not

established. Hill v. Commonwealth, 191 Ky. 477, 230 S. W. 910; Meyers v. Commonwealth, 194 Ky. 523, 240 S. W. 71; Miracle v. Commonwealth, 228 Ky. 591, 15 S. W. (2d) 429; Woodall v. Commonwealth, 230 Ky. 698, 20 S. W. (2d) 722. The principle is thus trenchantly stated by Judge Robertson in Miles v. Edelen, 1 Duv. 271:

> "To establish a controverted fact, proof is the end, evidence only the means. Proof establishes the truth—circumstantial evidence only leads toward it; and any pertinent and legitimate facts, conducing to the proof of a litigated fact, are evidence of the fact, weaker or stronger, according to the entire character and complexion of it, or as opposed or unopposed by conflicting evidence."

The defendant may be guilty of the very repulsive and unnatural charges laid against him. But it was not unnatural that he should have undertaken to conceal the disgrace that had come upon his daughter and that concealment is the only circumstance tending in the remotest degree to prove him guilty of murder.

The evidence was not sufficient to sustain a conviction, and a verdict of acquittal should have been directed by the court.

We need not consider nor express an opinion as to the other points raised in brief.

Judgment reversed, with directions to grant the appellant another trial.

Whole court sitting.