## Sloan et al. v. Commonwealth.

(Decided March 19, 1935.)

L. C. LITTLE for appellants.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

462

This case presents a mysterious murder from the mountains of Jackson county. While a young man was looking for kindling wood in January, 1934, he discovered the bones of a man scattered on a rock ledge about 8 feet above the surrounding ground and several hundred feet from any pathway or road. Rotting overalls, a hat, bill of a cap, and shoes were likewise here and there, on and near this ledge; the overalls being found in the top part of a tree which had been cut down some 40 or 50 feet away from the scattered skeleton. A pocketbook with certain papers and a ring in it were also found. There were the remains of a fire and evidence of a carbide lamp having been "dusted" there. The skull had two holes in the back which were apparently made by bullets. There was a long hole in the jawbone. The clothing and contents of the pocketbook were identified as having belonged to Logan Rose. His brother also identified the body by a broken tooth which he said he remembered having been caused twenty years before when Logan bit a guitar string in two. Logan Rose had disappeared six months before this time.

The deceased's wife, Mae Rose, her father, Jim Sloan, her brother, Hardin Sloan, and a cousin, Emory Johnson, were indicted for the murder of Logan Rose. It appears that Johnson was tried separately and convicted, but there is nothing whatever in this record connecting him with the death or with the other defendants or with the deceased, whom he testified on this trial he had not known. Upon the joint trial of the other three persons named in the indictment, the court peremptorily instructed the jury to return a verdict of acquittal for Hardin Sloan. The widow and father-in-law were convicted of murder and sentenced to the penitentiary for life. We are of opinion that they, too, were entitled to a directed verdict of not guilty.

In March, 1933, Rose came with his family and belongings from Indiana, where he had been living, to the home of his wife's father, Jim Sloan. After staying there three or four weeks he returned to Indiana, leaving his wife and little girl, but came back in July. The commonwealth merely showed that a week or so later his absence from the neighborhood was noticed.

It appears that not long afterwards a search was made for Rose and that there was speculation in the community as to whether he had killed himself or had not done so. The defendant Jim Sloan had stated that he did not believe Rose had killed himself or that there was anything wrong with him, for he had "gone off that way before." Ike Sloan, a close neighbor and kinsman, testified that the afternoon before he was missed or went away, Logan Rose and Jim Sloan and others had stopped at his house out of the rain, but that Rose and Sloan had left and gone towards the latter's home. A day or so before that, Rose was in McKee and had exhibited a roll of money to several witnesses. The entire evidence against the accused consisted of proof of statements made by them after Rose's disappearance. One day in McKee two or three months afterwards, Stanley Harrison asked Jim Sloan about Rose, and he said "they had got a letter from him and that he was in North Carolina at his sister's." Others testified that from time to time upon inquiry Sloan had said that he had heard that Logan was at Red Lick and that he had gone over there to see if he was there and learned that he had gone to North Carolina. Another said that Sloan had reported that Logan had left the state.

Leonard Moore testified that Sloan told him that Rose's wife had received a letter from him and that he was on Red Lick staying at one of the Webbs. Said he:

"Me and him stood and talked for I guess three-quarters of hour or maybe an hour. He didn't seem to want to talk to me. He would stand and kick in the dirt with his feet like any kid would. Sometimes he would turn around and look in the direction of where it is said they found Logan's carcass."

Furthermore, he said that Sloan had related how before he left Rose had given him five or ten dollars and his pocketknife and had hung his watch around his child's neck. He stated that he was wearing Logan's clothes, and when witness said, "Logan will come back and kill you," Sloan replied, "Logan is gone from this country," and that he and his wife "got along bad— that is the talk we had; it is pretty well the talk we had." On another occasion Sloan asked Moore to tell

one of Rose's brothers to send the money which he owed Logan, to his wife; that she had a letter from Logan saying for him to do so. This witness had not testified before the grand jury or on the examining trial of the accused or the trial of Johnson, although he was present on the last two occasions. His evidence and demeanor do not make a favorable impression upon us.

Tice Rose testified that he owed his brother Logan $15 for many years, and that Sloan wanted him to pay this money to Logan's wife and said that Logan would "never be seen no more, that he would never be heard tell of no more"; that he had a letter over at his house from Logan for him to pay the money to Mae. Hobart Lakes testified that Sloan told him nothing more than the rumor of the country that they had heard of Logan being at Sand Gap and had not heard from him personally.

Emory Johnson, who had been convicted under this indictment, as we have related, testified that in November, 1932, he and Sloan were talking about Mae and her husband, who Sloan said was working in Indiana and had taken Mae back out there and "let her go half naked, and the next time he took her back he would kill him."

The evidence against Mae Rose is even less substantial. Kate Gabbard testified that she asked Mae if she had heard from Logan, and she said that she had; that "she had a letter from him, that is my understanding." The witness did not remember that Mae had said, "I got a letter." A few days after Logan disappeared she went to Harm Lakes and stated that she had been told that Logan had passed there, and asked about it. Mrs. Lakes responded that she was not certain that it was Logan and asked, "Why, Mae, has he gone again?" She answered:

"Logan left and he was acting queer. I think he has killed himself from the way he was acting."

The daughter of the witness testifies that Mrs. Rose was crying and said her husband had gone off without a word, that he had never stayed away before when he left, and that she was afraid that he had killed himself. A week or so later she asked Mrs. Rose if she had heard from Logan, and she said that he was at

the same place, Connersville, Ind., and wanted her to come back there but that she didn't want to go. It was developed from Mrs. Lakes that a man, whom she had taken to be Logan Rose, had passed her house about 8 o'clock of the morning he had disappeared. This was a mile from Sloan's home.

Another witness stated that Mrs. Rose told him she had heard "he took another woman and run away." Emory Johnson related that seven or eight weeks after Rose disappeared he was at the house while Mae was sweeping, and that she laid down the broom and picked up a garter and said it was her husband's. He asked where he was and "she said he is dead. Then she said she had heard he was dead."

From several of these witnesses whom it had introduced the commonwealth established that there was never any trouble between the deceased and the defendants, and that they had always gotten along well. The place where the bones were found was about two miles from Sloan's home, in a different hollow; he had had a corn patch about a mile away, but there was no connection by road or path.

The foregoing is a full and complete detailed statement of the commonwealth's evidence—all of it coming in without objection. Notwithstanding its unsubstantial character, the court overruled the defendants' motion for a directed verdict.

Briefly, it was shown by the defendants, and in no way contradicted, that on the afternoon before Rose disappeared he and Sloan had gathered blackberries nearby and had gone to Ike Sloan's out of the rain. The next morning they went together to find a bucket left in the berry patch. They came home and Sloan went to town to get some Red Cross flour and returned aboupt 2 or 3 o'clock in the afternoon. This fact was established by several disinterested witnesses. After Sloan had gone to town that morning, Logan tied his watch around his little girl's neck without saying a word, then went into the yard, and came back into the house, where he looked through a catalogue, threw it down, and went out in the yard and up Sand Lick (presumably a roadway in that direction). Several witnesses testified to having seen him on the road going in that direction later on at a time after Sloan had gone to town.

The defendant Mae Rose was twenty years of age when she testified, and had been married since she was fourteen years old. There had never been any trouble between her husband and herself or her people. It was proved that both defendants had made inquiries about Logan Rose's whereabouts and had tried to find him. There were some implications that a neighbor might have known something about his death. They had heard different rumors which seemed to have had their foundation wholly in speculation and neighborhood gossip. Sloan made a trip to the community where Rose's mother and people lived and heard there that he had gone to North Carolina. Mrs. Sloan's father, who said he was nearly a hundred years old and lived in that section of the country, heard that Rose's brother or sister had had a letter from him, and he carried the news to Sloan's household.

The defendants admit having made many of the statements attributed to them, all of which they say were based upon their information. It is observed that nearly all the witnesses had testified that the defendants had merely said they had heard of Logan and that a letter had been received from him. There were denials of the statements which indicated a personal knowledge of his whereabouts, and some corroborative evidence of those denials.

To refute any inference that the accused had gotten any of the money which the deceased was shown to have had, their continued poverty was established; it being shown by a merchant that Sloan's father had paid for most of his provisions and clothing, both before and after the disappearance. The money he had paid his lawyer was the proceeds of the sale of a tract of land which had been given him by his father and sold for the purpose of raising money to defend himself and daughter.

It was developed that in the spring, when Rose had brought his family from Indiana, he had given a twenty-five automatic pistol to Sloan, but he had sold it some time before the disappearance and the purchaser had it pawned to another at the time. Sloan stated that he had owned only a shotgun, and there was no evidence that he owned or was ever in possession at any time of any other weapon.

The commonwealth undertook by several witnesses to prove that Sloan had a bad reputation, but failed with the exception of one or two witnesses whose evidence is not very substantial in this respect. On the other hand, Sloan proved a good reputation.

The evidence on both sides covered a wide range and the trial all but resolved itself into a court of inquiry. We have recited every part of it which tended towards establishing the guilt of the defendants. The absence of any proof of guilt is so evident that there need be little comment. It is fundamental justice that no person may be convicted of a crime merely upon suspicion. Sometimes it is difficult to draw the line between suspicion and circumstance, but it is not so here.

Another well-defined law is that where circumstantial evidence may be harmonized with innocence as well as with guilt, no conviction can be sustained. In this regard we have the disappearance of a man shown to have been in possession of a roll of money, and the finding five or six months later of his skeleton, two miles away from the home of the defendants, in an almost inaccessible place in the mountains, with some unaccountable surrounding conditions. His pocketbook was emptied of everything except some worthless papers. His clothing was scattered about, the overalls being 40 or 50 feet away in the top of a tree. There had been a fire, and the ashes of a miner's lamp were found there, although there was no mine in that country. There was found there a part of a cap not identified. There is no attempt to explain these things. So far as the record discloses, there was no weapon found. Motive and opportunity are not only absent from the record, but the converse is established. The only thing produced against the accused are some statements inconsistent with the true conditions, from which suspicion may be drawn that the defendants had tried to conceal those conditions. But they are not unnatural under the circumstances and are shown to have been founded on what they had heard after making inquiries. The nature and temperament of these people must enter into any consideration of the circumstances.

The legal sufficiency of evidence to take a case to a jury is a matter of law. Although courts are perhaps reluctant to give a directed verdict of not guilty where

a crime has been committed because of insufficient evidence to show the guilt of the defendant on trial, the same rule in respect to testing evidence applies in the prosecution for crime as in a civil action. The same reluctance exists when it comes to reversing a judgment founded upon the verdict of a jury of the vicinage. In the case at bar, however, there is not a scintilla of evidence to be found in this large record from which an inference of guilt of these people can arise. The trial court should have peremptorily instructed the jury to find them not guilty, and it becomes the duty of this court to reverse and set aside the judgment on that account. Denham v. Commonwealth, 239 Ky. 771, 40 S. W. (2d) 384; Baird v. Commonwealth, 241 Ky. 795, 45 S. W. (2d) 466; Helton v. Commonwealth, 242 Ky. 386, 46 S. W. (2d) 487; Hardy v. Commonwealth, 248 Ky. 77, 58 S. W. (2d) 237; Davidson v. Commonwealth, 252 Ky. 354, 67 S. W. (2d) 486.

No other question is passed upon.

Judgment reversed.