## Helton et al. v. Commonwealth.

(Decided April 21, 1936.)

ROSE & HUFF, for appellants.

B. M. VINCENT, Attorney General, and A. E. FUNK, Assistant Attorney General, for the appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER, Reversing.

The appellants, Garfield Helton and Mrs. Crit Goins, have been sentenced to the penitentiary for life for the murder of Crit Goins. He lived with his family at Draper, a mining town, about a mile from Evarts, in Harlan county. Helton made his home in Knox county. Goins was killed about 6 o'clock in the evening of March 16, 1935.

Helton and Mrs. Goins are second cousins. A year or more before Goins was killed, Helton stayed in his home for three or four months, during which time he and she together peddled clothing and dry goods as agents of a Cincinnati firm. Except the testimony of a son that his father had told his stepmother "Garfield didn't need to be there," the evidence is that there was no objection on the part of the husband to the situation. Mrs. Goins testified that she and her husband bought out Helton's interest in the agency and he was back at their home but a few times during the year. It is not shown that there was any meeting elsewhere of the man and woman, except once or twice, Mrs. Goins testified, she and her husband by chance had met him on the street. Both deny any improper relations at any time.

Some time in the late summer of 1934, Helton made an application for $2,000 insurance policy, representing himself to be Crit Goins. He paid $10 of the premium at the time, and directed that the policy, naming Mrs. Goins as beneficiary, be mailed to Goins at Evarts. It appears, however, that when the local agent received the policy and went to deliver it, he found that Goins was not the man who had applied for the insurance, so it was never delivered. Mrs. Goins came to the agent's office with a notice of the balance of $10.50 due on the premium and offered to pay it, but the agent advised her to mail it to the Louisville office whence the notice had come. She testified that her husband had given her this notice and told her to go and pay the premium, as he was afraid to do so. For the first time he disclosed to her and other members of his family that he had had Helton to pose for him and obtain the insurance, and cautioned them to say nothing about it as it would get him in trouble. No one contradicts her on this point. Helton testified that he and Goins were good

friends and that he had done this at Goins' request, as he (Goins) had had some spells and was afraid he could not pass a physical examination. Helton later told him he did not get the insurance.

The foregoing evidence, obviously, was for the purpose of proving a motive for the killing of Goins pursuant to the charge that it was done by the defendants in conspiracy. Accepting the proof of the commonwealth prima facie, the evidence perhaps discloses some motive, but in connection with the natural and uncontradicted developments by the defense, it hardly affords even a suspicion of evil design. Even so, a conviction cannot be had on mere proof of motive. Denham v. Commonwealth, 239 Ky. 771, 40 S. W. (2d) 384.

Segal Goins, who was not quite ten years old at the time, testified that he did not know whether it was his father or mother who first suggested going to Evarts that evening, but his mother sent him across the railroad to the store to call his father. They were going to get some shoes and to make a payment on furniture. He saw his mother give his father $30. She told her husband that she had been out all day and was tired and wanted to rest her feet. Charlie Davidson, a nephew, asked Goins to go with him to Evarts, and Mrs. Goins said that if he wanted to go with Charlie to go on, as she "wasn't aiming to go"; but his father waited and insisted on her going. It appears that the tracks of both the Black Mountain Railroad and the Louisville & Nashville run close by. The mother wanted to walk on the Louisville & Nashville track, because there was a light on it, but the father insisted on going the other railroad, and that is the way they traveled. The boy testified that when they reached the point where the two railroads cross, perhaps a half mile away, he and his mother were sitting on the side of the track about 15 feet from his father when a man came from a train of cars towards them. He was wearing a gray overcoat and had a gray hat pulled down over his eyes, and a white cloth over the lower part of his face. The child understood this man to say, "Hello," and something else, but he didn't know whether anything was said about giving up any money. As his father reached in his pocket where he had put the money, this man shot twice. His father ran down un-

der the bridge, and his mother grabbed him by the hand and they ran under the train. She sent him for help, and he returned with a man named Creech. They looked about until they found Goins' body under the bridge a hundred steps or so away. When the boy told his mother, she fainted. Concerning the description and identity of the man who killed his father, he testified:

"He was a tall man, about as tall as Mr. Helton, but he was bigger out through here." Asked specifically, "Was that Garfield Helton that shot your father?" he answered: "It didn't look like Garfield."

A deputy sheriff testified to having seen Helton in the town of Wallins about an hour before the killing is said to have occurred. It is eighteen miles from Draper or Evarts. This was all of the evidence introduced by the commonwealth. It merely showed that the defendant Helton was within eighteen miles of the scene of the crime perhaps an hour before it was committed, and nothing more.

The testimony of Mrs. Goins is substantially the same as that of the child, except that she says there were two men who got off the train and approached them, both of whom were masked, and one demanded, "Give up the money." As her husband reached for his pocket, he fired at him. Neither of these men was Helton. There was denial of any reason for or any conspiracy or participation in the crime.

Helton, by his brother, Hayes Helton, Matt Hyden, and himself, proved that he had come from his brother's home in Knox county on Friday, the day before the killing, to see Hyden at Wallins about renting some land. He stayed that night with Hyden. Helton says he left there about 2 o'clock Saturday afternoon (judging by the time the 1:15 train ran), caught a ride with a drummer named French to Barbourville, and then had a taxi take him about 7 miles to the end of the highway, and walked the three miles to his brother's home. Two or three witnesses say he reached there before dark. It is about 55 miles from the scene of the crime.

His presence at his brother's home is established not only by the defendant and his brother, but by three or four other witnesses who are apparently disinterest-

ed. There was a "singing" that night at Hayes Helton's house, where the church choir was trying out some new song books, and these witnesses were in attendance there. John Howard and his wife corroborate Helton in saying that it was on Friday afternoon, and not Saturday, that the deputy sheriff had spoken to him at Wallins. Helton admits that he owned a gray overcoat, but his brother says that on this trip he had worn his (the brother's) coat, and not his own. Although not very satisfactorily established, it was shown that Goins had only about $3.50 in his pocket when dressed for burial. Officers testified that when Helton was arrested about two months later, he said he had not been in Harlan county for several months. Helton says that he told them he had not been "up that way in over a year," referring apparently to the place of the crime. Thus the only evidence developed from the defense that could possibly be construed against either of the accused was that Helton owned a gray overcoat, which was the color of the coat worn by the murderer; and his statement made after arrest, which is susceptible of being a contradiction. Some inferences of guilt would be drawn from Helton's failure to call as witnesses the drummer and taxi driver with whom he says he rode that afternoon. He made a reasonable explanation for their absence; but the more important point is he was not called upon to establish a defense when there was no evidence against him.

It is the duty of a trial court to direct a verdict of not guilty where there is not sufficient evidence to take the case to the jury. No conviction can be had or sustained upon circumstantial evidence which may be harmonized with innocence as well as with guilt. Sloan v. Commonwealth, 258 Ky. 461, 80 S. W. (2d) 553. We perceive no evidence in this record tending to connect either of the defendants with the commission of this crime. The only eyewitnesses are the widow and child. The former positively says it was not Helton who did the killing, and the latter says the culprit did not look like him. The evidence negatives rather than establishes any concert of action on the part of the widow with the murderer. We are of the opinion, therefore, that the court should have directed a verdict of not guilty.

Judgment reversed.