## Coleman et al. v. Commonwealth.

March 8, 1940.

R. Monroe Fields, Judge.

Burke & Sanders and L. J. May for appellants.

Hubert Meredith, Attorney General, and Wm. F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellants, together with Ann Taylor, Alex Adkins and R. W. Rowe, were charged in a true bill with murder, committed on September 7, 1938, it being charged that one of the parties named "did kill and slay Kathleen Francis by an assault upon her with hands, fists, feet and in other ways and manner," and that others of the accused were present abetting in the acts which caused the death of the girl.

When the case was called the appellants and Adkins moved for severance, and the motion was sustained, whereupon the commonwealth's counsel elected to try appellants and Adkins. The jury returned a verdict of guilty as to the two appellants, with a penalty of three years' confinement in the State Reformatory, and under direction of the court, returned a verdict of "not guilty" as to Adkins.

Motion for a new trial, supported by seven or more grounds, was overruled; judgment was entered and appeal is prosecuted, it being argued in brief for appellants that the court committed prejudicial error in several respects. However, upon a review of the record we find it only necessary to discuss:

"(1) The evidence in this case does not show the existence of criminal agency as to the cause of the death of deceased, therefore the court should have peremptorily instructed the jury to find for accused, particularly at the close of all the evidence."

The facts and circumstances related show that the Francis girl met her death about three o'clock on Sunday morning, September 7, 1938. Appellant Coleman, in company with R. W. Rowe and Adkins, (jointly indicted) Ted Robinson and Alvin Rowe, a brother of R. W., for several hours had been making the rounds of various road houses. Following these visits to neighboring places, the parties named above wound up at the Wil-

liamson house some time around 2:30 or 3 a. m. Upon arrival Coleman and R. W. Rowe alighted from the automobile. In the meantime another party had driven up in a red truck. Kathleen Francis was one, and another a girl by the name of Verna Hughes. Their two male companions were not identified, as far as the record shows.

After Coleman and Rowe got out of their car, the girls came over and got into the car, together with Coleman and Rowe, with witness Robinson, and perhaps others, and drove a short distance "up on Shelby." One of the girls then asked to be driven back to Emma Williamson's place, and the request was complied with. When the party got back to Emma's place, Coleman and the Francis girl got out; knocked on the door and after some time were admitted to the house. Alvin Rowe and Adkins followed them into the house, leaving Robinson and R. W. in the car.

Robinson and his companion dozed off to sleep. Up to this point there is little or no conflicting evidence, nor is there any evidence to show any ill-feeling or disagreement among the parties. It developed that the Hughes and Francis girls had come from Prestonsburg with their companions, and were strangers to the Coleman party; at least Coleman said he had never seen the Francis girl prior to that night.

Robinson, testifying, said that after he and R. W. had been dozing for some time, he heard a commotion; loud talking and screaming inside the house. He looked up and saw Coleman and Adkins coming out with the Francis girl. It seems that she was having a quarrel with Ann Taylor, who was at the Williamson house. As Coleman and Adkins came out "packing the girl," Ann Taylor and Emma Williamson followed, the latter having in one hand what witness "took to be a beer mug, and a beer bottle in the other." Emma was calling the Francis girl a "G. D. whore." After they got out of the house and turned the girl loose, "Joe started beating her; knocked her down once or twice, and kicked her once or twice in the soft part of her back, and once in the head. He kicked her while she was down." Quoting:

"The girl got up and she came to the car where I was and was setting with her feet out on the running

board on the right-hand side. She asked me to scoot over, and I did and she got in the car and asked me whose car it was and I told her. She asked us to take her home or to town and get the law. I told her I would if it was my car. She then got out of the car, Joe walked over and told her he would beat the hell out of her, and buy her anything she wanted, and she said, 'I don't want anything you buy.' The girl then started walking down the road and was gone about five minutes and R. W., he started down the road; said he was going to see where the girl went to, and he was gone about five or ten minutes and come back and said somebody had run over her."

After R. W. came back with the information that the girl had been run over, some of the party, including Emma, drove down the road to the place where R. W. had found her. On this trip, witness says, he heard Emma and Joe Coleman whispering, saying, "if the girl didn't die she would tell all she ever did know on them."

The place where the girl was found, as estimated by witness, was about 300 yards from the Williamson house. When the party arrived the girl had been taken into Polly Herrington's home, and was lying on a cot, apparently dead, certainly unconscious.

It was in the proof for commonwealth that after the Francis girl left, and before R. W. had gone down the road, two cars went down the road, and one up. Another car, driven by Clarence Rowe, a deputy sheriff, came up and stopped, after the party had been to the point, and asked them what was the "black thing he had seen lying back there in the road."

The testimony of Robinson, as related above, is corroborated by the testimony of other members of the party, without material variance. Clarence Rowe, the deputy sheriff, testifying for plaintiff, says that when he came near the Herrington house he saw a car parked in the road, and a crowd standing around. He was informed that a girl had been killed by being hit by a car. It was suggested that perhaps he knew her; he went in and examined her and found that she had a broken ankle; he thought she had a black smudge on the left side of her neck, a cut place on the left side of her head and

another on the back of her head. He saw blood under the body, which had leaked through the bed clothing; he "raised her up, and there was quite a bit of blood. under her body."

This witness started with her to the hospital; some of the party helped put the body in his car. She was unconscious and died on the way, and the deputy took her body to the undertakers. He fixes the distance from the Williamson house to where the body was found at about 300 yards.

After daylight the next morning, the deputy, in company with others, examined the road where the girl had been picked up. He found a bloody smear about 3 feet over on the right-hand side of the road, "going away from Pikeville." There was more blood directly in front of the house than there was at the lower end (about 13 steps) where "I judged it started from. It looked like a body had been dragged over the road and left a bloody smear." He made no examination to ascertain whether or not there was any blood, other than mentioned, between the Herrington and Williamson homes; nor did he examine the car in which the appellants and others were riding.

Appellant Coleman, testifying, gives in detail the movements of his party on the night in question. He says that the party (or some of them) and the Hughes and Francis girl went into the Williamson house. They were playing the "talking machine." The Francis girl was in another room. She came in where the others were and laid down on the bed talking to Emma's little girl. She acted like she was drunk, and rolled off the bed twice, and Emma asked appellant and Adkins to take her out and give her some air, or to take her back to Prestonsburg. The two got hold of her; lead her through the house and outside. She jerked loose and insisted that she was not drunk, and that Emma was trying to get rid of her. Emma denied this and suggested she come in and go to bed. She said, "No, I am aiming to go home." She commenced cursing Emma. Appellant asked the other boys to get her into the car, and she said, "No, you G. D. s. o. b., you are taking up for Emma and Ann Taylor, and I slapped her; slapped her twice, and said 'I'll whip you and take you in there

and buy you anything you want.' She said, 'I don't want anything you can buy me,' and walked over to the car and put her shoes on.'' Afterwards, as detailed by others, she went walking down the road; no one noticing anything unusual in her movements.

Emma Williamson testified in the main as to what occurred up to the time the girl walked down the road, as Coleman had detailed. When Kathleen came into her home she was drunk, loud and boisterous. She suggested that Coleman and Adkins take her out, and to Prestonsburg. There had been no difficulty up to the time the two had gotten Kathleen out of the house. The Hughes girl carried Kathleen's shoes out. The Francis girl began cursing and using abusive language toward Coleman and he slapped her, but did not knock her down or kick her. Witness then relates, as had Coleman, about putting on her shoes and walking down the road. She denies that she had either a beer mug or beer bottle. She was the one who suggested that some of the party go after the Francis girl. She saw no blood on her at the time she left, and the girl "walked like nothing was wrong with her." Witness denied the language attributed to her by Robinson and another witness, before and after the girl was taken from the Herrington house.

Jeemes Damron was at the Herrington place, and says that about 3:30 o'clock he heard a car pull off the concrete, above the house, and stop. He heard the brakes go on. Witness looked out the window and one man got out of the car, "came back down by the house, and passed out of sight. He then came back to his car; took a drink from a bottle, threw it across the road; got in his car and went on up the road." Witness later went out and saw the girl lying in the road just below the house, her body near the center of the road; "her face was laying on the black mark." Witness and others took her in the Herrington house. R. W. Rowe came up before the girl was picked up; others of the party came up later, and Clarence Rowe came up still later. After the girl was removed from the Herrington home witness saw blood on the concrete some distance down the road from the point where she was picked up. The next morning he walked up to Emma's place, but saw no blood, other than that he had described. On cross-examination he said the blood was "in splotches,"

covering a distance of six or seven feet. Another witness heard a car just before the girl was found in the road; "it made a noise like it was going to turn over in the yard there."

The commonwealth did not introduce the undertaker, nor his helper who took charge of the girl's body. Mr. Baker testified that he made an examination of the body and described marks. "The left hip was crushed; the back of her head was soft and bursted; there was a cut place on her forehead and a big hole about three inches in diameter about four inches above the spine, that had gone very deep. I probed in there as far as I could, I guess two or three inches; it kept oozing blood. Her right collar bone was broken, and her back and legs were skinned all over. The ankle had a hole in it about an inch in diameter, on the outer side." He said, "The wound on her back was a large one, looked like something had just rammed into it with a lot of force; the right side of her face and arms had some sort of heavy grease on it. Some on her legs."

Mr. Call, the undertaker, also examined the body, and he testifies, as did Mr. Baker, the helper, as to the presence of the various wounds and abrasions. This witness also went to the place where the body was found in the road. It was in the night time, and he used a flashlight in examining the road. He saw blood in the road which looked as if a body had been dragged up the road for twelve or thirteen steps. This witness also walked to the Williamson house, and found no traces of blood, other than such as he described. He found none in front of the Williamson house. Both undertakers were of the opinion that the girl could not have walked any distance after receiving the wounds which they described, and this proof, as well as the proof that the girl walked 300 yards down the road, stands uncontradicted. It is equally as evident that accepting the evidence of Robinson, one of the party, as being true, we cannot conceive that the alleged beating occasioned the wounds described.

Appellants for reversal rely solely on the ground that there was a complete failure to establish the corpus delicti, and we think their contention is well founded, as is evidenced by opinions of our court, and the courts of

other jurisdictions. Counsel rely on Com. v. Inman, 225 Ky. 667, 669, 9 S. W. (2d) 1000, 1001, and cases therein cited. Their argument is that an accused is not put to the test of answering a charge against him in the absence of evidence on the part of the prosecution sufficient to establish the corpus delicti.

The authorities, we have observed, all hold that it must be established by evidence, be the same direct or circumstantial, that the accused was connected with the infliction of the injury which caused the death. This proof, direct or circumstantial, must be sufficient to satisfy the understanding and the conscience of the jury beyond a reasonable doubt of guilt. As expressed by many authorities:

> "The corpus delicti ought to be proved either by direct testimony or by presumptive evidence of the most cogent and irresistible kind." State v. Sullivan, 34 Idaho 68, 199 P. 647, 649, 17 A. L. R. 902. See late cases of Denham v. Com., 239 Ky. 771, 40 S. W. (2d) 384; Tarkaney v. Com., 240 Ky. 790, 43 S. W. (2d) 34.

Proof of the charge in criminal cases involves the proof of two distinct propositions, first, that the criminal act was done, and second, that it was done by the persons charged and no others; in other words, proof of the corpus delicti, and identity of the persons. 3 Greenleaf on Evidence, Section 30.

The Inman case is peculiarly fitting in some respects to the facts as developed in this case. We shall refer the reader to the opinion for the facts. Upon a review there we held that the lower court had properly refused to submit the case to the jury. In so doing we said:

> "It is the theory of the commonwealth that the deceased was strangled. No witness testified that the injuries described by them were of a serious nature, or that they would have produced death. No witness was introduced who qualified himself to express an opinion as to the cause of Smith's death. It is significant that the commonwealth failed to introduce either of the physicians who examined the body immediately after its discovery or the coroner

or the undertaker. It is reasonable to suppose that any of these men would have been qualified to express an opinion as to whether or not the injuries found upon Smith's body were such as would reasonably have caused his death.

"The trial court apparently refused to give an instruction on murder and manslaughter on the theory that the corpus delicti had not been established. In cases of murder the corpus delicti consists of two fundamental facts: First, the death of the person alleged to have been murdered, and, second, the existence of criminal agency as the cause thereof." [225 Ky. 667, 9 S. W. (2d) 1001.]

As to the right and duty of the court to instruct peremptorily for the accused, where there has been a failure of incriminating proof, see Privitt v. Com., 271 Ky. 665, 113 S. W. (2d) 49, and cases cited.

Our opinion is that the court should have sustained appellant's motion for a peremptory, renewed after all evidence was introduced, and for his failure the judgment is reversed for a new trial.

Judgment reversed.