**COMMONWEALTH of Kentucky,**
**Appellant,**

v.

**Patrick O'CONNER, Appellee.**

**No. 2010–SC–000343–DG.**

Supreme Court of Kentucky.

April 26, 2012.

As Modified on Denial of Rehearing
Aug. 23, 2012.

Kathleen Kallaher Schmidt, Appeals Branch Manager, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, David Wayne Barr, Assistant Attorney General, Office of Criminal Appeals Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice CUNNINGHAM.

On August 24, 2007, Michelle Wright, a social worker with the Commonwealth of Kentucky Cabinet for Health and Family Services, made a visit to the Pulaski County, Kentucky home of Appellee, Patrick O'Conner. Mrs. Wright could observe Ap-

pellee's three-year-old son, as well as his seven-month-old infant, through the window of their bedroom. However, after repeated knocking, she could not cause anyone to come to the door. She then called Deputy Sheriff Larry Wesley, who soon arrived upon the scene. They continued to knock and eventually Appellee opened the door. He admitted being asleep in the back bedroom.

Upon entering the trailer, Mrs. Wright and Deputy Wesley observed a deplorable scene. The home was dirty and unkempt with animal feces. The kitchen was full of dirty dishes caked with moldy food and flies were plentiful. Clothes and trash were strewn throughout the living area. Also, there was no working toilet in the home.

Appellee was in the residence with three of his children: a three-year-old girl who weighed only 22 pounds; a three-year-old boy who wore size eighteen-month clothes; and a seven-month-old infant boy. His wife was asleep in their bedroom and an older daughter was at preschool. The two boys earlier observed through the window were still in their stifling bedroom, the door to which was wedged shut from the hallway with a screwdriver so that it could not be opened from inside. The three-year-old girl was also confined in her bedroom with a hasp and padlock attached to the door.

Although in mid-summer, the windows in both bedrooms were either closed or boarded up. There was no air-conditioning in the trailer and the only fans in operation were in Appellee's bedroom, where he had been sleeping when Mrs. Wright and Deputy Wesley first arrived. The temperature in Pulaski County on the day that the investigation was made reached 104 degrees.

The infant's diaper was urine-soaked and the three-year-old boy, apparently from hunger, had eaten his own feces. Two of the children had specks of feces on their bodies and none of the children's beds had linens. There was no food or water in the rooms where the children were confined. One of the boys had defecated under the dresser in his room and the one who was chewing on his feces complained of being hungry. The nightgown of the young girl locked in her room was also urine-soaked and she had an infected wound on her head.

Appellee asserted that the children had been in their bedrooms for two hours and that he had set his alarm clock to awaken him at noon. A check of the alarm clock, however, revealed that it was set for 6:30 a.m. A relative of Appellee testified that, upon visiting the trailer three weeks earlier, the three children were locked inside their bedrooms. There was also evidence that a fire had previously broken out in the same bedroom in which the boys were confined.

Social workers had made at least one prior visit to the home in June of 2007 and had found Appellee sleeping at three o'clock in the afternoon while the youngsters were locked in their bedrooms. On that occasion, the trailer was in a similar condition as it was on August 24th. On the previous visit, social workers had advised Appellee of the services available to him, including free daycare for the children so that he could work and provide for his family. At that time, Appellee was also advised that he should buy cheap fans to provide ventilation for the trailer. He heeded this instruction, but placed the fans in his own bedroom.

Appellee was subsequently indicted by a Pulaski County grand jury for three counts of first-degree criminal abuse. More specifically, the grand jury charged that he intentionally abused the three chil-

dren, each of which were under the age of twelve at the time, by placing them in a situation that could have caused physical injury or which was cruel confinement or cruel punishment. Appellee was sentenced to a five-year term of imprisonment for each count, to be served consecutively, for a total of fifteen years.

Appellee appealed to the Court of Appeals, which reversed the judgment of the Pulaski Circuit Court. Appellee claimed that the trial court should have directed a verdict of not guilty on the charges of first-degree criminal abuse because there was insufficient evidence of his intent to commit the crimes. The Court of Appeals agreed, declaring there was insufficient evidence to indicate that criminal actions by Appellee were intentional.

█ This Court is unanimous in deploring the unspeakable filth, unsanitary living conditions, and misery in which the three children were found. However, we are divided as to whether there was sufficient evidence of proof of Appellee's requisite intent.

KRS 508.100 defines the crime of first-degree criminal abuse as follows:

(1) A person is guilty of criminal abuse in the first degree when he intentionally abuses another person or permits another person of whom he has actual custody to be abused and thereby:

(a) Causes serious physical injury; or

(b) Places him in a situation that may cause him serious physical injury; or

(c) Causes torture, cruel confinement or cruel punishment;

to a person twelve (12) years of age or less, or who is physically helpless or mentally helpless.

"Abuse" is defined by KRS 508.090(1) as the

infliction of physical pain, injury or mental injury or the deprivation of services by a person which are necessary to maintain the health and welfare of a person or a situation in which adult, living alone, is unable to provide or obtain for himself the service which are necessary to maintain his health or welfare.

In the prosecution of this case, the instructions required that the jury find Appellee intentionally abused each of the three children, who were less than twelve years of age, thereby allowing them to be subjected to "cruel confinement or cruel punishment," or causing them to be placed at risk of sustaining "serious physical injury."

█ Courts are to direct verdicts of not guilty only in the most drastic situations where the Commonwealth has failed to produce proof whereby reasonable jurors could conclude beyond a reasonable doubt that a defendant is guilty. *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky.1991). Also, as clearly stated in *Benham*, in a motion for directed verdict, "the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Id.* at 187.

█ In assessing evidence as to sufficient proof of intent in criminal cases, the requisite intent may be determined from surrounding circumstances. All elements of a crime, including intent, can be proven by circumstantial evidence. *Matheney v. Commonwealth*, 191 S.W.3d 599 (Ky.2006); *Baker v. Commonwealth*, 307 S.W.2d 773 (Ky.1957); *Denham v. Commonwealth*, 239 Ky. 771, 40 S.W.2d 384 (1937); *Commonwealth v. Wolford*, 4 S.W.3d 534 (Ky. 1999). Hardly is the Commonwealth ever fortunate enough to present direct proof as to the thought process in a defendant's mind.

In the *Wolford* murder trial, this Court was confronted with a slightly different twist from the one now before us. The Court of Appeals reversed manslaughter convictions of the defendants on the grounds that the facts of the case could only constitute an intentional murder. We find here, as we did in *Wolford*, that the Court of Appeals substituted its own fact-finding discretion in place of that of the jury. Whereas, in *Wolford*, we held that the jury could have reasonably concluded that the defendants were guilty of a lesser crime than murder, we find here that the jury had sufficient evidence to reasonably conclude that Appellee was guilty of the major offense of first-degree criminal abuse.

Persons walking into Appellee's trailer and surveying the scene on August 24, 2007, as did Michelle Wright and Deputy Sheriff Larry Wesley, could have reasonably concluded, based on their observations and what was presented to the jury, that these three children were being intentionally abused. Appellee was asleep in his bedroom in the middle of the day, cooled by the only fans in the trailer. The children—all of tender years—were locked in their rooms by way of wedge screwdrivers and hasps on one of the hottest days of the summer. The window in the room of the three-year-old girl was boarded up. The toddlers were clad in urine-soaked clothes and their filthy bodies were speckled with feces. One of the little boys was hungry to the point of eating his feces. All of this in spite of Appellee having been warned, on at least one. previous occasion, about these unacceptable living conditions. A fire had previously broken out in one of these rooms, requiring the door to be knocked down to rescue the child inside. These are all facts put before the jury and by which it was not unreasonable for them to conclude that the abuse of these helpless babes was intentional. As fully set out in Appellee's brief, much evidence was advanced to explain these conditions. An abundance of exculpatory and mitigating matters was presented. However, it has been the long-standing law in this state that it is within the jury's province to consider and believe, believe in part, or totally disregard as non-credible any evidence presented. *Gillispie v. Commonwealth*, 212 Ky. 472, 279 S.W. 671 (1926); *Catlett v. Commonwealth*, 246 S.W.2d 580 (Ky.1952); *Bierman v. Klapheke*, 967 S.W.2d 16 (Ky.1998).

Like in *Wolford*, we find that the Court of Appeals did not properly defer to the jury its proper fact-finding role in this case. Accordingly, we reverse the decision of the Court of Appeals and remand this case to the trial court for reinstatement of the trial order and judgment.

MINTON, C.J.; ABRAMSON, NOBLE, SCHRODER and VENTERS, JJ., concur. SCOTT, J., dissents by separate opinion.

SCOTT, J., dissenting:

I must respectfully dissent. I cannot join the majority's judgment that there was sufficient evidence to convict Appellee of *intentional* abuse. I cannot join the majority in perpetuating what I believe to be an unreasonable interpretation of a statute. And I cannot join the majority in upholding the fifteen-year prison sentence and *violent* offender status of a defendant whose most "violent" act was falling asleep with his children's bedroom doors wedged shut to keep them in the house, rather than out in the streets. What is most frustrating to me in this case is that we are wasting one of our prison beds (with a $50,000 construction cost *alone*, irrespective of operating costs) on a "napping parent."

I begin by noting that the majority overstates the facts in this case. First, there

was no padlock in the hasp on the door that secured one of the bedrooms shut. Second, the majority describes the children's bedrooms as "stifling," and thus unintentionally overemphasizes the temperature on the day of the investigation. While the high temperature on August 24, 2007 may have been 104 degrees, the low was 77 degrees—at 7:00 a.m. The social worker did not come to Appellee's home during the heat of the day—she arrived at 10:00 a.m.[1] In fact, the social worker described the temperature at 10:00 a.m. as "comfortable," but getting warmer.

Lieutenant Whitaker described the conditions outside the house around *noon* as not warm, but getting warm. Moreover, Chief Wesley admitted that he left the children in their rooms for thirty minutes after arriving (although the bedroom doors may have been, and hopefully were, open). Of course, if it was stiflingly hot in their rooms it would have behooved the officer and the social worker to remove them more quickly.

The majority also overemphasizes the home's only fans being in Appellee's bedroom, rather than the children's bedrooms. However, no parent would put a fan in a room with an unsupervised three-year-old and seven-month-old, unless, of course, they wanted to risk a trip to the emergency room so doctors could reset or replace the children's broken or chopped fingers.

And while the majority tries to paint a picture of a parent who *intentionally* abuses his children, the social worker who originally visited the home in June 2007 reported that both parents appeared to be nurturing and loving to the children and met their basic needs.[2]

In short, none of the facts in this case suggest that Appellee intentionally abused his children. In Kentucky, "[a] person acts intentionally with respect to a result or to conduct described by a statute defining an offense when *his conscious objective* is to cause that result or to engage in that conduct." KRS 501.020(1). Thus, to have been convicted of first-degree criminal abuse, Appellee's conscious objective must have been to abuse his children, or to permit them to be abused. KRS 508.100(1). " 'Abuse' means the infliction of physical pain, injury, or mental injury, or the deprivation of services by a person which are necessary to maintain the health and welfare of a person...." KRS 508.090(1).

There is no evidence that any pain was inflicted upon the children. There is no evidence that the conditions in the home caused any physical injury.[3] And there is no evidence that confining the children in their rooms caused them any mental injury. In fact, neither the police nor the social workers said the children needed medical care as a result of the conditions at Appellee's home. The children were not taken to the hospital, and did not even see a doctor until the following week.

Moreover, the only evidence that suggests that these children were being deprived of any services is that the three-

---

1. The record establishes that the children had been in their rooms from 8:00 a.m. to 10:00 a.m. Appellee had taken the children outside to play earlier that morning; they played for about an hour before he brought them back inside and laid down to rest.

2. Appellee's wife worked part-time at Pizza Hut to support the family, while Appellee stayed home with the children.

3. The record reflects that the three year-old girl had an infected wound on her head, but there is no allegation that this wound was caused by abuse, by the conditions in the home, or by confinement.

year-old girl had an infected wound on her head—an injury deemed not serious enough to require immediate medical attention. The majority does not venture to explain exactly what services these children were being deprived of, and the only light the Commonwealth's brief sheds on the matter points out that Appellee's family *was receiving* food stamps and had medical cards.

The evidence simply does not support a conviction for abuse. Any conclusion to the contrary is not only erroneous, but also comes at a cost of incarcerating a *napping parent* in one of our prison cells when social services has a multitude of ways to address and resolve the matter locally.

There being no evidence whatsoever of *active* abuse, in my opinion, the only way the majority can reach its holding is by redefining the phrase "*permits* another person of whom he has actual custody to be abused...." KRS 508.100(1) (emphasis added). Importantly for us all, I do not believe the General Assembly intended negligent acts of omission to constitute *intentional* abuse under KRS 508.100. Rather, the more reasonable interpretation of "permits ... to be abused" in this instance (and the one I believe the legislature intended) is a situation where a parent or custodian *allows another person* to abuse his or her child (or a child in his or her custody); to not defend his or her

child against abuse; or to stand on the periphery while another is actively abusing his or her child. Ignorantly subjecting one's children to potentially dangerous forces of nature is *not* what the General Assembly had in mind for *intentional* child abuse.[4]

Clearly, the evidence here suggests that Appellee locked the children in their rooms *to protect them*, albeit inappropriately. In fact, his statement to the police indicated that one of the three-year-olds had gone near the stove earlier that same morning, and he feared that the children could be endangered if able to roam the home. Moreover, he had taken medication that morning and laid down intending only to rest but had fallen asleep. Anticipating this possibility, and not wanting his children to hurt themselves or leave the home, he locked them in their rooms. Thus, the evidence, in my opinion, tends to *disprove* any allegation of intentional abuse.

Nevertheless, the majority attempts to explain its conclusion, in part, by emphasizing the shocking (and unfortunate) scenario of the three-year-old boy putting feces in his mouth. This however is not evidence of intentional abuse; this is called "pica," a common medical phenomenon in which individuals, often children, eat substances with no nutritional value. *See generally* American Psychiatric Association, *Diagnostic and Statistical Manual of*

---

4. Rather, the legislature almost certainly intended such cases to be brought under the wanton endangerment statutes. Indeed, in the rare, tragic cases where adults leave small children confined in cars on hot days, the adults are charged with wanton endangerment, KRS 508.060. *See, e.g., Commonwealth v. Lawson,* Case No. 11–F–006098 (Jefferson Dist. Ct.2011) (charges dismissed); *Commonwealth v. Lee,* Case No. 11–F–005924 (Jefferson Dist. Ct.2011); *but see Commonwealth v. Shouse,* Case No. 11–CR–002559 (charging mother with both wanton endangerment in the first degree *and* criminal abuse in the

second degree, both of which require proof of "wanton" culpability).

> KRS 508.060(1) states:
> A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person.

It seems to me that this provision encapsulates precisely the type of conduct that is at issue in most "hot car" cases.

*Mental Disorders* 95 (4th ed.1994) (herein-after *DSM IV*).[5] In fact, "coprophagy," a subtype of pica, deals exclusively with the habitual consumption of feces. *Dorland's Illustrated Medical Dictionary* 401 (29th ed.2000). In any event, a three-year-old boy putting feces in his mouth is not indicative of intentional child abuse, but rather improper training on the part of the parents. It is an unfortunate circumstance, yet one with a medical explanation. Indeed, "poverty, neglect, [and] lack of parental supervision ... increase the risk for the condition." *DSM IV* at 95. The boy did not put feces in his mouth because he was starving, he did it because he hadn't been trained *not* to.[6]

To be found guilty of criminal abuse in the first degree, the Commonwealth must prove, beyond a reasonable doubt, that the defendant "intentionally abuse[d] another person or permit[ted] another person of whom he has actual custody to be abused *and* thereby: (a) [c]ause[d] serious physical injury; or (b) [p]lace[d] him in a situation that may cause him serious physical injury; or (c) [c]ause[d] torture, cruel confinement or cruel punishment to a person twelve (12) years of age or less...." KRS 508.100(1) (emphasis added). Because I believe that the Commonwealth did not carry its burden of producing evidence that Appellee intentionally abused his chil-

dren or permitted his children to be abused, under KRS 508.090, I would not reach the second inquiry—i.e., whether such alleged abuse caused "serious physical injury," etc.

But two other important matters still must be addressed: Appellee's status as a *violent* offender (for napping!),[7] and his fifteen-year prison sentence. First, it is beyond my comprehension how a person who was found guilty of child abuse by *omission* can be a "violent" offender.[8] The record reflects unsanitary living conditions, and that on at least one occasion Appellee locked his children in their rooms so he could take a nap. Thus, I am befuddled as to how this man can be labeled "violent." No evidence was introduced that he physically assaulted his children; no evidence was introduced that he used dangerous weapons or instruments in disciplining his children; and no evidence was introduced that he otherwise caused them physical injury. Indeed, no evidence was introduced that he ever *touched* his children. Common sense tells us that he is not "violent" by any definition.[9]

Finally, Appellee's fifteen-year prison sentence is totally inappropriate, considering all the better ways social services could have solved this matter locally (and for a

---

5. Pica is most often seen in young children. "The condition is not often diagnosed but may not be uncommon in preschool children." *Id.*

6. The majority also notes that the girl's bedroom window was boarded shut, as if that were evidence of intentional abuse. To the contrary, Appellee boarded that window up in response to a request by social services to put screens on the windows. As Appellee's family did not have the financial means to purchase screens for all of their windows, he boarded the window in his daughter's bedroom so that she could not stick her head outside when it was raining (as she had done during the Cabi-

net's previous trip to Appellee's home), and so that insects could not get into her room.

7. KRS 439.3401(1)(i) labels a person convicted of criminal abuse in the first degree as a "violent offender."

8. Again, I assume Appellee was found guilty of child abuse by omission because there is absolutely no evidence of any *active* abuse.

9. *Black's Law Dictionary* defines "violent" as: (1) "Of, relating to, or characterized by strong physical force"; (2) "Resulting from extreme or intense force"; or (3) "Vehemently or passionately threatening."

fraction of the cost of imprisonment). As stated above, there is no evidence that he is a violent person. And if he is guilty of any crime it is at worst a Class A misdemeanor.[10] Rather, this should have been handled as a civil action for neglect[11]— Appellee may be incredibly slothful and mentally inept, but he is not a threat to society.

The purpose of Kentucky's civil dependency, neglect, and abuse statutes is to protect children's rights to, among other things, "adequate food, clothing, and shelter." KRS 620.010. This seems to be the chief concern presented by this case. Fifteen years behind bars is not going to teach Appellee proper parenting skills.

Here, rather than give Appellee the support he needs to be an effective parent, we are throwing him in prison where he can learn how to become an effective criminal. As an *amicus* brief in a recent, high-profile United States Supreme Court case summarized:

> Being in prison increases an individual's proclivity toward future criminal behavior—the "criminogenic" effect of America's prison system.[12] Studies show that placing low-risk offenders in the same prison population as high-risk offenders increases the chances that the low-risk inmates will recidivate, suggesting that the low-risk individuals may be learning more serious criminal behavior from their fellow inmates.[13]

Brief for Center on the Administration of Criminal Law and 30 Criminologists as Amici Curiae Supporting Appellees, *Brown v. Plata*, —— U.S. ——, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011) (No. 09–1233), 2010 WL 4380229 (previously *Schwarzenegger v. Plata*).

Nor can the taxpayers of Kentucky afford the financial burdens of incarcerating people like Appellee. At the least expensive prison facility in the Commonwealth, Bell County Forestry Camp, it costs taxpayers $14,716.25 per year ($40.32 per day) to house one inmate.[14] At the most expensive facility, Northpoint Training Center, it costs taxpayers $30,326.28 per year ($83.09 per day);[15] and that does not take into account the $50,000 per bed construction costs! If those numbers stay the same over the next fifteen years, the taxpayers of the Commonwealth will have spent between $220,743.75 and $454,894.20 to incarcerate a "napping parent." That is unconscionable considering Appellee is only guilty, in my opinion, of poor parental

---

10. Appellee could conceivably be convicted of wanton endangerment in the second degree pursuant to KRS 508.070(1), although I express some doubt as to whether the facts support such a conviction. Wanton endangerment in the second degree is a Class A misdemeanor, KRS 508.070(2), which would carry a maximum prison sentence of twelve months, KRS 532.090(1).

11. *Black's Law Dictionary* defines "neglect" as: (1) "The *omission* of proper attention to a person or thing, whether inadvertent, negligent, or willful; the act or condition of disregarding"; or (2) "The failure to give proper attention, supervision, or necessities, esp. to a child, to such an extent that harm results or is likely to result." (Emphasis added).

12. Citing Martin H. Pritikin, *Is Prison Increasing Crime?*, 2008 Wis. L.Rev. 1049, 1056–56 & nn. 30–38.

13. Citing Pritikin, *supra* note 12 at 1055 & n. 23.

14. Kentucky Department of Corrections, About BCFC, http://corrections.ky.gov/depts/AI/BCFC/Pages/AboutBCFC.aspx (last visited Mar. 6, 2012).

15. Kentucky Department of Corrections, About NTC, http://corrections.ky.gov/depts/AI/NTC/Pages/AboutNTC.aspx (last visited Mar. 6, 2012).

judgment and keeping a filthy house.[16] Social Services could have handled this matter much better.

Let us not forget that in January of this year Kentucky released almost 1,000 inmates from its jails and prisons—*because we cannot afford to incarcerate them.* Indeed, this case illustrates precisely why the General Assembly passed the Public Safety and Offender Accountability Act[17]—to provide non-dangerous inmates the community-based programs and supervision they need, and keep them out of the prison population. I do not see how the citizens of the Commonwealth are any safer with Appellee in prison for fifteen years. Rather, with parenting classes and help from the Cabinet, Appellee could provide a suitable home for his children, and (maybe) be a contributing member to our society—all for a few hundred thousand dollars less than we are spending to keep him incarcerated. Courts are doing a disservice to the citizens of this Commonwealth by reflexively putting people like Appellee in prison at the expense of having to release others, who I must assume are more threatening to society than a napping, slothful parent. Moreover, what has this solution done for this family?

In conclusion, I would affirm the judgment of the Court of Appeals, because there was insufficient evidence to find Appellee guilty of anything other than very poor parenting.

---

16. And *perhaps* second-degree wanton endangerment. *See supra* note 10.

17. 2011 Ky. Acts 4–69, *available at* http://www.lrc.ky.gov/statrev/tables/11rs/actsmas.pdf (last visited Mar. 6, 2012).