## Morgan v. Commonwealth.

Jan. 21, 1941.

James C. Carter, Jr., and Harlan E. Judd for appellant.

Hubert Meredith, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Reversing.

Hytie (Mrs. Alex) Morgan is appealing from a judgment on a verdict finding her guilty of the crime of voluntary manslaughter and fixing her punishment at three years in the penitentiary. Mrs. Morgan and her sons, Aubrey and Ewell, were charged with the murder of Cull Morgan in June, 1939. Cull was a brother-in-law of Mrs. Morgan and the uncle of her two sons. Aubrey was tried first. He was found guilty and his punishment fixed at 21 years in the penitentiary. We affirmed that judgment in Morgan v. Commonwealth, 284 Ky. 124, 143 S. W. (2d) 1063. The bill of exceptions was not made a part of the record in that case, so the only question before us was whether the indictment supported the judgment. It did. It was pointed out in the

opinion, however, that, since all of the evidence as to Aubrey's guilt was circumstantial, we deemed it advisable to read the transcript of the testimony. The testimony showed a chain of circumstances of sufficient strength to connect Aubrey with the commission of the homicide and to justify the submission of the question of his guilt or innocence to the jury.

Mrs. Morgan was tried next. All the evidence as to her connection with the commission of the homicide is circumstantial. She offered no evidence in chief. The principal ground urged for reversal is that the evidence did not fairly and reasonably import guilt to Mrs. Morgan and therefore her motion for a peremptory instruction should have been sustained.

The Commonwealth earnestly insists that the evidence, though circumstantial, is of such character that it cannot be reconciled with the presumption of Mrs. Morgan's innocence, and that it is such as to exclude every reasonable hypothesis of her innocence. It is necessary that we review briefly some of the evidence.

Cull Morgan's body was found in the Cumberland River near Bakerton late in the afternoon of June 19, 1939. He had been dead for several days. There were bruises about his head and a gash on the back of it. There was also a hole in his neck which the coroner testified appeared to be about the size of a .25 caliber bullet hole. There was a small rope tied around his body. The evidence warrants the conclusion that Cull was killed in a barn on a place owned by him and his brother, Alex, and in which he had been making his home for a short time. Two axes were found there with stains on them. There is little doubt that at least one of the axes was used in the commission of the homicide. It also appears that the body was taken from the barn to the river, a distance of about three-quarters of a mile, and to a point some three or four miles above where it was found. The piece of rope about the body had been cut from a rope on a corn planter near the river bank. A knife which had been used to cut the rope was found in Mrs. Morgan's home. It was hidden in an upstairs room occupied by her sons. This knife was not identified as belonging to Mrs. Morgan. It appears to have been the property of her son, Aubrey. Mrs. Morgan had Cull's .38 caliber pistol. She also had a .32 caliber

pistol. She told officers that she had had Cull's pistol for about a year. There is evidence, however, that persons saw Cull with his pistol during the time Mrs. Morgan said it was in her possession. There is also some evidence that Mrs. Morgan had attempted to hide the pistol, but an officer testified that Mrs. Morgan told them where the pistol could be found in her home. Be this as it may, we find no evidence indicating that the .38 caliber pistol was used in the commission of the homicide. An officer testified that Mrs. Morgan told him that she had had some trouble with Cull and had shot at him, but was only trying to scare him. This apparently happened while Cull was making his home with Mrs. Morgan's family. Cull owned property in addition to that which he owned jointly with his brother, Alex. He had other relatives, and at the time of the settlement of his estate Alex bought Cull's interest in the tract of land owned jointly by them. There is also some evidence that Mrs. Morgan, on being asked whether Cull had any money, said that he had paid for a team of mules and had some money left a short time before he was murdered. The latter evidence, of course, was offered with the view of showing a motive for the murder of Cull. But there is this significant bit of evidence as to the relationship between Cull and Mrs. Morgan on or about the day that he was murdered. A neighbor testified that he saw Cull, Mrs. Morgan and Aubrey on the road near the church on Wednesday or Thursday before Cull's body was found in the river and that the parties spoke "as friendly as I ever heard." It appears that Aubrey was raising a crop on Cull's place, and, according to testimony of an officer, Mrs. Morgan said that Ewell had had an argument with his father about working a mule and that he had gone to stay with Cull a few days before he was murdered.

We turn now to a review of the circumstances with which Mrs. Morgan was more directly connected. We may say at this time that it was not shown conclusively whether the incidents to which we will hereinafter refer occurred on the Thursday or Friday before Cull's body was found on the following Monday. Two witnesses testified that Mrs. Morgan told them that she had seen Cull on Thursday, one witness saying that she later changed the date to Friday, about planting some peas on ground that had been plowed for corn. We have

noted also that another witness testified that he saw Mrs. Morgan and Cull at the mail box on Wednesday or Thursday. Duff Allen testified that as he was on his way to Luther Crawley's about 5 o'clock Friday afternoon he met Mrs. Morgan on the road about 150 to 200 yards from where "you turn off to go to Cull's place," and that she was traveling in the direction of that place. He said that he returned from Crawley's place about dark, and that he met Mrs. Morgan coming from the direction of the place where you turn off to go to Cull's place, and that she was nearer to that place than when he had passed her earlier. We have noted that other witnesses testified that Mrs. Morgan told them that she saw Cull on Thursday or Friday. Mrs. Dollie Crawley, who lived about a quarter of a mile from the barn where Cull was living (the barn was not visible from her home), testified that on Thursday or Friday she heard voices over in the direction of Cull's about dark. She said, "When I first heard them it was not so dark, I heard two men's voices, I didn't pay no attention much, but it kept getting louder, seemed like one woman talking and I run out on the porch to see if I could find out what it was; I could not understand and I went back, still I heard voices after I come back in, that was either Thursday or Friday." She said she heard the voices for some 10 or 15 minutes. This witness also testified that she heard a shot in the direction of Cull's place, but she could not say whether she heard it on the same evening that she had heard the voices. Two other witnesses testified as to hearing a gun shot in the direction of Cull's place, one of them saying it was either on Thursday or Friday before his body was found, and the other that it was during the week before his body was found. Neither of these witnesses testified as to hearing voices in that direction. Several witnesses testified that when they went to Cull's place about 9 o'clock Monday night they found Mrs. Morgan and Ewell sitting in front of the barn. Some of these witnesses testified that when something was said about a body being found Mrs. Morgan said, "Oh, Lord, I bet that is old Cull," or words to that effect. Mrs. Chester Bledsoe, a sister of Cull's, testified that Mrs. Morgan said that they had covered up an ax, which had been found buried in manure in the barn, to keep the rogues from getting it, and that the blood on it was from Aubrey's finger and that she could prove it by Harley McCoy. This witness further testi-

fied that Aubrey had not been accused of the crime at the time Mrs. Morgan made that statement.

The question is, Does the circumstantial evidence heretofore reviewed point with more than a suspicion toward the guilt of Mrs. Morgan? After reviewing the evidence the Commonwealth says in its brief:

"So, summarizing, what do we have in this case? We have her presence at the time or approximately at the time both by her admission and by witnesses who saw her in proximity and by hearing a woman's voice. We have the fact of shots fired and the pistol which fired the shots found in her possession and concealed by her. We have further her admission that the person killed must have been the deceased, when no mention had been made of whose body had been found. All these facts point more than a suspicion. They conclusively and unalterably connect the appellant with this crime."

We cannot agree with this conclusion. Mrs. Crawley said that the voices heard in the direction of Cull's place kept getting louder "and seemed like one woman talking." She did not say that she definitely heard a woman's voice, nor is there any showing whatever that the voice which seemed like a woman's voice was that of Mrs. Morgan. There was testimony as to a pistol shot in the direction of Cull's place, but Mrs. Crawley was unable to say that she heard the shot on the same day she heard the voices. Furthermore, we have indicated that Cull's pistol was a .38 and the only evidence as to the size of the hole in the back of Cull's neck was that it looked like a .25 caliber hole. It was not definitely shown that this hole was made by a bullet. While Duff Allen testified that he met Mrs. Morgan on two occasions late Friday afternoon near the place where you turn off to go to Cull's barn, he did not say that he saw her going or coming from the direction of the barn. By her own admissions Mrs. Morgan said she saw Cull Thursday or Friday and gave a reason for seeing him. She gave as a reason for being at the barn Monday night her desire to get her son, Ewell, to come back home. Her explanation when told that a body had been found was not necessarily unnatural. One of her sons was staying at the barn where Cull had been making his home; the other was cropping on Cull's place. There

is every reason to believe that Mrs. Morgan knew that Cull was missing.

Whether we have a suspicion as to her connection with the crime is not the test of Mrs. Morgan's guilt or innocence; nor are we concerned with any part which her sons, Aubrey and Ewell, may have played in the commission of the homicide. We have no hesitancy in saying that the circumstantial evidence presented in the record before us does not fairly and reasonably connect Mrs. Morgan with the commission of the homicide. Such being the case we think the judgment must be reversed. Hill v. Commonwealth, 191 Ky. 477, 230 S. W. 910; Moore v. Commonwealth, 223 Ky. 128, 3 S. W. (2d) 190; Pardue v. Commonwealth, 227 Ky. 205, 12 S. W. (2d) 288; Bright v. Commonwealth, 235 Ky. 781, 32 S. W. (2d) 351; Tarkaney v. Commonwealth, 240 Ky. 790, 43 S. W. (2d) 34; Collins v. Commonwealth, 243 Ky. 438, 48 S. W. (2d) 1053; Drake v. Commonwealth, 264 Ky. 261, 94 S. W. (2d) 684.

Judgment reversed.