## Taylor v. Commonwealth.

March 26, 1943.

C. A. Noble and Scott E. Duff for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and defendant in the indictment, Walter Glenn Taylor, was convicted in the Perry circuit court of the crime of murder, and punished by life im-

prisonment in the penitentiary. Though his motion for a new trial—which was overruled—contained a number of grounds as alleged prejudicial errors, but two of them are urged on this appeal for a reversal of the judgment. They are: (1) Error of the court in overruling appellant's motion for a peremptory acquittal, and (2) if mistaken in ground (1), then the verdict is flagrantly against the evidence. Those grounds, it will be perceived, concern exclusively the testimony heard at the trial.

The decedent and victim of the alleged offense was Elizabeth Jones, appellant's mother-in-law. His father-in-law, and husband of his victim, was Curtis Jones, who, with his wife, lived in a two-story frame residence located in the mining village, or camp, of Hardburley, in Perry county, some seven or eight miles from Hazard, its county seat. The ground occupied by the residence was near the bottom of a mountain or large hill, with a sloping surface of nearly 45 degrees, which necessitated the rear part of the building being elevated some 40 feet and resting upon timber posts 12 inches square. The building had a porch around the outside along two of its walls beginning at the upper end and extending along one side, and then across the rear elevated end. Near midway of the back porch was a bathroom heated by a kerosene stove, and in which was kept a can containing kerosene for heating the stove. The entire building contained nine rooms and its proprietor rented the surplus to miners as lodging quarters.

At the time of the fire, in addition to Curtis Jones and wife, the building was occupied by their son Troy Jones and his wife, and by appellant's wife and their three infant children. There were also other occupants not related to the Jones family. On one side of the house was an alley across which was a garage, and just beyond it was another residence which was occupied by Walter Jones and his family. One of their children was spending the night of the fire with its grandparents. The house was burned on the early morning of December 11, 1941, between the hour of 2:30 and 3:00 o'clock. Appellant and his wife were married some five years prior to the fire which destroyed the life, not only of decedent, but that of Troy Jones and the child of Walter Jones and wife. The indictment charged appellant with feloniously

setting fire to the building which destroyed the lives of the three mentioned.

The evidence is entirely circumstantial and it is insisted that under the rule in such cases it was insufficient to connect defendant with the burning, and, therefore, an acquittal should have been directed. Appellant worked as a coal miner in a plant located in the vicinity, and had also worked at other mining operations in other parts of the county prior to accepting employment at Hardburley. He appears to have led a life of indifference toward his family—his conduct consisting chiefly in neglecting the home by staying away at night until late hours in the morning, and sometimes not returning at all. That habit, with some other departures from duty as the head of a household, caused friction to arise between him and his wife. For that reason, or some other cause, the couple, with their children, moved into the Jones residence some six weeks or more prior to the fire. Defendant, however, did not improve his conduct thereafter, and in about three weeks the couple separated—the wife of appellant with her children continuing to remain in the residence of her parents.

For the major part of the following three weeks defendant visited the Jones residence—each time imploring his wife to rescind her determination of separating from him. On such occasions he endeavored to get possession of some or all of his children, but was prevented from doing so by his wife, his mother-in-law and, perhaps, other members of the family. A few days before the fire, and on one of his visits to the Jones residence, he repeated his former request for his wife to return to him and likewise endeavored to take from her their infant child, and which occurred in the presence of Troy Jones, appellant's brother-in-law, who interceded on behalf of his sister and commanded appellant to "turn loose of the baby," which he was attempting to take from its mother. Troy then said to appellant: "You have been running over the house when I wasn't here, and I am here this morning and aint none of that going on." Appellant responded by saying: "Troy, I wouldn't do nothing to you, you are my wife's brother." He then sat for awhile before leaving, and upon his departure he said: "I will get even with all of you." We have been unable to find where defendant denied that conversation in his testimony.

In the afternoon before the fire the following night appellant and a friend by the name of David Jones went to Hazard. The day of the week was Tuesday, and appellant failed to report for work on that day, which was the first day he had taken off from work for quite awhile. After arriving at Hazard he and his companion, with others—both male and female—engaged in pleasure driving around and in the city of Hazard, visiting road houses and other rendezvous for the major part of the afternoon until a late hour at night, when defendant visited his mother, who resided in the outskirts of the city, at about 12 o'clock. He testified that he obtained from her some ingredients for a compound for the treatment of bronchitis, or a severe cold, with which he said he was suffering. The basic ingredient of that remedy was kerosene, which he stated his mother did not have, and just before leaving Hazard that night he obtained a can of kerosene from a gasoline station where he had left the automobile and its inmates preparatory to obtaining transportation back home to Hardburley; but he made no explanation of what became of his companion, or the automobile in which they made the trip to Hazard. The can containing the alleged kerosene was put in a paper sack. Defendant later contacted one Daughtry, who operated a taxicab and who was about ready to make a trip to the Colonial Club, located on the route from Hazard to Hardburley. He procured Daughtry to carry him that far. From that place he walked along the same route towards his home to another settlement called Rendezvous. At that place he met with Clarence Licklider, who was also operating a taxicab, and whom defendant hired to transport him to his home.

Hardburley is located in a more or less ravine running a short distance from Mexico, a settlement further down the valley, and through which the public road ran. Appellant got out of the taxicab after writing an order for the payment of the transportation charge, to which he signed, not his name, but that of Arthur Taylor, whom he said owed him $2. Upon alighting from the taxicab he pointed out a place by the side of the road where he told the driver he had left an automobile. He also told the same person that he had gasoline in the can he was carrying.

After the separation of appellant and his wife he obtained rooming quarters at the home of the witness,

Robert Middlebrooks. The latter testified that appellant came home between 12:30 or 1:00 o'clock on the night of the fire and remained in his room for some ten or fifteen minutes and then went away for about the same length of time, when he returned and remained about the same time, followed by another departure for about the same time, when he returned the third time. He then built a large fire in the fire place in the room he occupied; that at about 3 o'clock appellant called to the witness three times and said: "Do you hear that woman hollering?" The Jones house was about two or three hundred feet across the valley on the opposite hillside from the Middlebrook's residence. Witness stated that he saw the fire, which was entirely on the ground under the elevated portion of the Jones residence, and that he saw no other fire in other parts of the building. Other nearby neighbors testified to the same facts, and also stated that the fire appeared to be running on top of the ground from a pile of kindling under the burning dwelling, apparently burning nothing, thereby clearly indicating that the blaze was following a trail of some inflammable substance that had been poured on the surface.

Curtis Jones and some of the lodgers in his residence in the earlier part of the night visited the place in the alley referred to, where water was sometimes heated in a tin tub for laundry and other household purposes, and which had been so used in the afternoon preceding the fire. One of those witnesses stated that some cinders of coal at that place were under the tub, but he threw water on it and entirely extinguished all fire thereunder. Curtis Jones, in making such explorations in the early part of the night, also examined the bathroom, which could be reached from the outside of the building by steps running up from the ground. There was no fire therein, and witness testified that the can of kerosene was then located at its regular place. It was found the next morning after the fire in the little branch at the rear of the residence, unscorched, and with a small remnant of kerosene in it, clearly indicating that the fire did not originate in the bathroom. That it did not so originate was also shown by the testimony of other witnesses in giving their location and description of the fire at or shortly after its inception.

A neighboring witness testified that she was awak-

ened by the firing of some shots over at the Jones residence, and Curtis Jones testified that he was the one who fired them after he discovered the fire and had located it under the house, as hereinbefore described. That witness testified that about the time she heard the shots someone ran by the rear of her house and while doing so coughed some two or three times. Some of the witnesses testified that they saw appellant at the fire; but he was inactive and for a part of the time was leaning against a post at the upper end of the dwelling, and none of them testified that he made any effort to rescue any of the inmates of the house, or to remove therefrom any of its contents, although he testified that he did assist in removing the contents from the adjoining home of Walter Jones, whose house was also burned, but no witness corroborated him in that testimony.

One of the nearby neighbors (Clarence Long) testified that after the building had been practically consumed—and at about 5:00 o'clock in the morning—he returned to his residence accompanied by appellant, with whom he had gone to the fire, and when they arrived at his home appellant asked him: "Well, what do you think about the fire? * * * Do you believe I set it?" Mrs. Middlebrooks testified corroborating the testimony of her husband, and further stated that she cleaned up the room occupied by appellant each morning and on the one in question she discovered, in emptying the ashes from the grate, some metallic attachments to shoes worn by miners. Defendant admitted that they were from shoes worn by him and which he had burned in his grate some few days prior to the occasion of the fire, but the witness stated that she had not discovered them until the next morning following the fire.

When defendant was arrested he was wearing two pairs of trousers. On the under pair were some burrs and thistles, such as grew and were in the back premises of the Jones residence. His overcoat was in the same condition and had splotches of mud on it. The testimony showed, and defendant admitted, that he knew that the can of kerosene was in the bathroom, as well as the purpose for which it was kept therein. He failed to introduce either the can that he obtained from the service station in Hazard, or the witness who sold him the

product contained therein, whatever it may have been; nor did he introduce any witness to prove any of his activities while in Hazard. However, he did testify that he went to that place with his friend, David Jones, for the purpose of enlisting in the army, but that the person in charge stated to him that the government was not then enlisting colored persons, and that he would have to return after that conclusion was reached.

Some three or four witnesses occupying rooms in the burned building, on being apprized of the presence of a fire because of smoke arising therefrom, searched all of the inside rooms and spaces, discovering no fire in any of them. There were other proven facts and circumstances pointing to defendant's guilt, but of less convincing force than those we have rehearsed.

We are cited to a number of cases, formerly rendered by this court, all of which approve the universal rule that while conviction may be had on purely circumstantial evidence, it should be of such a convincing nature as to exclude every reasonable hypothesis of innocence and to convincingly sustain the conclusion that the defendant on trial was guilty of the offense charged. A recitation of the cases holding that a conviction may be had on circumstantial evidence alone is unnecessary, since it has been so often declared by this court as to become a settled principle in the administration of the criminal law. The cases so holding are listed in volume 6, page 396, Criminal Law, key 552(2) of West's Kentucky Digest, and the Pocket Part thereto. They hold that in order to warrant a conviction under such testimony the evidence should produce—in addition to what we have already said—more than to create a suspicion of guilt, but where the circumstances "fairly and reasonably import guilt" a conviction should not be disturbed. Bright v. Commonwealth, 235 Ky. 781, 32 S. W. (2d) 351, and Morgan v. Commonwealth, 285 Ky. 184, 147 S. W. (2d) 378.

The testimony, as we have so briefly rehearsed it, clearly proves that the fire was of incendiary origin. Likewise, it establishes that no one had a motive to commit the deed of burning the residence other than the defendant, and that he had threatened to get even with the members of the Jones family for protecting his wife and children from his constant annoyance and importunities for her to return to him, and from seizing the children

and carrying them away. His action on the night of the fire was most peculiar and negatived any efforts on his part to rescue any member of the Jones family from the fire, or to salvage any property from the burned residence. The location of the can of kerosene, as found the next morning—unimpaired by fire—clearly indicates that the fire did not originate in the bathroom, but that the can in some manner had been taken therefrom before the bathroom was consumed. The running of the streaks of fire on the bare surface of the ground, as testified to by a number of witnesses, clearly indicated that it was following the trail of some inflammable substance, as we have hereinbefore stated. The various contradictions, some of which we have recited, conclusively show that, either all of the witnesses testified falsely, or that defendant did so. The jury concluded that he was the falsifier, which it had the right to do, and which conclusion was sustained by the clear preponderance of the testimony, and contradicted only by defendant himself. He did not deny making the threat to get even with the members of the family, nor did he deny burning his shoes, nor the presence of burrs or thistles found on his clothing. He also failed to put a single witness on the stand to prove his whereabouts or his purpose throughout the afternoon preceding the fire. Such well established circumstances point unerringly to his guilt, although it might not be sufficient to exclude the possibility of defendant's innocence, but which may be said with reference to all contested issues arising in all sorts of litigations. Therefore, in cases like this one, each case must rest upon its own facts, and when they are such that a jury would be authorized under the law applicable to the particular character of case, to find against the defendant, this court is without authority to reject its finding.

We, therefore, conclude that the grounds urged for a reversal of the judgment are insufficient for that purpose, from which it follows that it should be and is affirmed.