## Hendrickson v. Commonwealth.

December 1, 1950.

Rehearing Denied February 16, 1951.

J. B. Johnson, Judge.

Hiram H. Owens for appellant.

J. J. Tye, V. A. Jordan, S. B. Knuckles, James Inman, A. E. Funk, Attorney General, Zeb A. Stewart, Assistant Attorney General, for appellee.

STANLEY, COMMISSIONER—Reversing.

The appellant, Herschel Hendrickson, has been convicted of the murder of his brother-in-law, Elmer Sevier, and condemned to pay the extreme penalty of death. It is rare indeed that this court finds not sufficient in law to have even authorized the submission of the case, the evidence which a jury believed beyond a reasonable doubt to justify a verdict of such fatal consequences. The deficiency is principally the absence of proof of corpus delicti. The conviction, it would seem, may have resulted from the introduction of evidence that the defendant had been twice previously convicted of separate felonies.

Sevier and his wife, Ethel, and the appellant with his father and sister, lived within a few hundred yards of each other in a remote section of Knox County. Mrs. Sevier was Hendrickson's sister. The families were on intimate and friendly terms. It is not even suggested that there had ever been any trouble between them.

About midnight of January 19, 1950, the family of Arthur Mills, who lived about a quarter of a mile away, saw Sevier's small frame house on fire. When some of them got over there, the roof and walls of the building had fallen in. They saw the bones of a body near the fireplace or between it and the bed. Mills described the body as "setting up; looked like he had one of his arms over the bedstead." The conditions were described by two other witnesses in about the same way though differing in detail. About seven o'clock the next morning the sheriff and county attorney and many others went to the scene. Several witnesses say there were two bodies in the embers. Later, according to the Commonwealth's

evidence, parts of two bodies were found, five or six feet apart. Overall buckles, a pocket knife and what were identified as Sevier's false teeth and a breast pin, which had belonged to his wife, were recovered from the ashes. A coal oil or kerosene can without a cap on it was found close to the bodies. The Seviers had kept a five gallon can of kerosene for their lamps and "to burn." After their removal to Corbin, all the bones that could be recovered were examined by some doctors, who seem to have formed some sort of board of investigation at the instance of the officers or Sevier's family. Dr. Terrell testified they were of bodies of a man and a woman. The Commonwealth failing to call them, the defendant introduced Dr. Davis and Dr. Ohler. They had found no bones they could identify as masculine and thought all came from one body, that of a woman. Another doctor, who was a member of this group, was not available on the trial. Elmer Sevier and his wife have not been seen since that night.

There was sufficient proof that one of the bodies in the fire was that of Elmer Sevier. The critical point is whether there is evidence that he was murdered or that that element of corpus delicti was established. Circumstantial evidence and some admissions of the defendant claimed by the Commonwealth to be incriminatory were relied upon for the conviction. It is well recognized that to sustain a conviction there must be proof not only that there was a death but that that death was caused by a criminal agency, that is, that a crime has in fact been committed. Where that factor is sought to be established by circumstantial evidence, if the facts proven may be reasonably reconciled with the presumption of innocence, or are as consistent with the absence of crime as with the perpetration, it is not sufficient to prove corpus delicti. Denham v. Commonwealth, 239 Ky. 771, 40 S. W. 2d 384; Hawk v. Commonwealth, 284 Ky. 217, 144 S. W. 2d 496.

It is not questionable that corpus delicti may be and often is proved by circumstances or presumptive evidence. Roberson's Criminal Law, Sections 421, 424. The Attorney General directs our attention to Wendling v. Commonwealth, 143 Ky. 587, 137 S. W. 205, 206. There could be no question of the crime having been committed there. It was established that the body of a little

girl had been burned in a furnace. The conduct and statements of the defendant were not consistent with innocence. The several other cases cited are distinguishable on the facts also. And it may be said just here that the evidence in this case of statements and conduct of the accused which were introduced as being incriminatory, as will be developed, are not, in fact, admissions but mere circumstances which cannot, within the same rule of measurement, be regarded as sufficient. In this connection consideration must be given to the character, habits and degree of intelligence of the accused, for, obviously, conduct or attitude of one man may reasonably import innocence while the same conduct and attitude in another man may reasonably import guilt.

The defendant had been employed at odd jobs here and there and went about fixing clocks, sewing machines and the like. He was a trapper and hunter to such an extent that he was generally called "Rabbit." On the night his sister and brother-in-law met their death in their mountain home, Hendrickson was alone in his. His father was in Bell County and his sister had left two days before to go to the home of another sister in Knoxville to have a baby. He is hard of hearing and had the custom, as the Seviers had, of banking his fire in the grate in the night. These facts are certain. We may regard as only affecting his credibility, and as applying to his explanations and denials, the fact that he had been previously convicted of a felony. Offsetting this, however, is the testimony of several witnesses that since he returned from the penitentiary some years before he has borne a good reputation for peace and quiet.

Ewell Scott (whose son had deserted the defendant's pregnant sister) lived 400 or 500 yards in an airline on a hill above the Sevier house. He testified that "a little better than dusky dark" he heard a shotgun fire once in that direction, apparently inside the house for it was a muffled sound, and immediately afterward heard a woman screaming. That appeared to be on the outside. He did nothing about it and did not mention it to his family until he told his wife some time later. He did not know anything about the fire until late the next morning. Jim Sevier, an uncle of the deceased, heard a shotgun fire in that direction about "dusky dark" when it was too late to see game. He says it was very clear and dis-

tinct but says nothing about any woman screaming. The defendant testified that that afternoon he had been bird hunting and visiting his traps and had gone by the Sevier house. He had eaten supper with them the evening before. That evening "about dusky dark" Tom Mills, a neighbor, and Pearl Engle, went by Hendrickson's home to get some cold tablets for Mill's mother. There was a little delay in answering the door. When Hendrickson opened it, he had on a miner's cap with carbide light on it and his shotgun. The visitors sat around about half an hour when he said something about "hating to rush us off" and asked us to go hunting with him. Mills had also seen the defendant with his rabbit box leaving his home early that afternoon. Hendrickson describes this visit and states that he had been hunting doves that afternoon "out in the bottom," but the relation to the direction of the Sevier house is not disclosed.

When Mrs. Delilah Mills was awakened by her son that night, the Sevier house was "burning way high." She saw a light come on through the window of the Hendrickson house, which was between her and the burning building. Her son and Jim Sevier, an uncle of the dead man, and his boy, on their way back from the fire saw a shadow and heard someone walking around inside the house. They called to Hendrickson several times, but he did not answer. The witnesses knew that banked fires will "flash up" once in awhile and it probably accounted for the light. The defendant testified that after banking his fire, he went to bed about eight o'clock and heard nobody calling him. He did not get up until about seven o'clock the next morning when the officers came.

The sheriff and the county attorney went to the house that morning. Hendrickson invited them in, and according to the sheriff, acted quite naturally. He said he did not know about the fire but showed no concern. After thirty or forty minutes of questioning, Hendrickson freely went with the officers to the scene of the fire. He told them he had been there that afternoon between five and six o'clock after setting his traps and that he had fired his shotgun over there at some doves. There were a number of shoe tracks around the place. He willingly took off his shoe, which fit into the tracks; but he had told them that they would find his tracks all over the place.

A fired shotgun shell was found close to the house like some shells in Hendrickson's home, and his gun showed evidence of having been recently used. The sheriff testified Hendrickson had not asked about his sister and her husband when he was told of their house burning down. While on the premises, the county attorney asked him if he could imagine what had happened to them, and he responded he had no idea unless they were at his sister's home on the hill. When his attention was directed to "a lump" in the embers and was asked if he knew what that was, he turned to Jim Sevier and asked, "Do you suppose it could be somebody?," or, "Uncle Jim, what do you think of that?" When he replied he thought it was the bodies of his sister and brother-in-law, it seemed, according to the attorney, "to take him back a little bit" and he responded, "Do you reckon that's right?"

When the defendant had been taken to jail, he willingly consented "to take a lie detector" test but hesitated about taking a "truth serum" until his doctor said it was all right. He explained in his testimony he remembered his brother talking about the use of some drug by the Germans and its bad effect. When his doctor told him it was all right, he consented to take the truth serum. Instead of being submitted to these so-called tests, he was discharged from custody. Later he was rearrested. In the meantime, all his actions were consistent with innocence.

A state policeman made an investigation. He asked Hendrickson his opinion as to what had caused the fire, and he said he thought his sister had gotten too close to the fire (in the grate) and caught her clothing on fire and that her husband, in trying to put out the fire, had "sucked the flame down his neck," and it killed him. This can hardly be regarded as an incriminating admission. All of his other responses were in accord with what he had told everybody else and what he testified to on the witness stand.

Notwithstanding the uncontradicted evidence that the defendant had always been on friendly and neighborly terms with his sister and her husband, who had helped him and his father and sister, it was sought to establish the motive which had induced the man to murder them and undertake to hide his crime by burning the house down was the robbery of a pair of slippers and overshoes, some sacks of flour and possibly a little money.

But when we look at the evidence of motive it seems to us to be reduced to irrelevancy, either to establish corpus delicti or culpability. Let it be remembered that motive, though an important factual element in a prosecution for crime, is not sufficient in itself to sustain a conviction. Fyffe v. Commonwealth, 301 Ky. 165, 190 S. W. 2d 674, 675. It is argued that there were some evasions and unlikely explanations in the story he told the officers. It was shown that the deceased had at this time perhaps $75 or $100. He had loaned the defendant $20 a few days before. The county attorney's inquiries of the defendant the morning after the fire included a question as to how much money he had. He produced three $20 bills and some additional funds aggregating $70.35, and told the officer he had borrowed $20 from Sevier. On the trial the defendant went into detail as to the source of his funds and its use. It appears the deceased had four paper sacks of flour in his house, having about a month before exchanged some wheat for eight sacks, and given four of them away to his father and brother. Afterward his father saw three lard cans of flour at the defendant's home. A police officer testified Hendrickson told him the Seviers, seeing the need of himself, father and sister, had given him some flour, and he had given the Seviers two bushels of potatoes in trade. He had burned the paper sacks and put it in the cans. In the ashes of the burned house was "a carbon chunk" such as burnt flour will make. The qualitative difference between this item is of no more probative value than that of the possession of the money.

The testimony as to the overshoes and slippers is quite voluminous. The deceased had bought overshoes with four buckles on them about six weeks before. Hendrickson was in possession of similar shoes the morning after the fire. It is admitted, of course, that they are in common use in that community. The defendant told the officers he had bought the shoes on the 18th at Sears' "Army Store" in Corbin and had taken his old shoes to a shop near the depot for repair. He had bought the slippers at Daniles' store, his sister, Mrs. Sevier, having given him the money to buy them with. The failure of the merchants to have a record or to remember having sold such shoes or any others to Hendrickson proves little or nothing. None of the witnesses know Hendrickson, even by sight. However, the "Army Store" sold a

different brand, but they also handled all kinds of army shoes. Some time after being accused, Hendrickson had asked the salesman at the store if he remembered selling him some overshoes, and he did not. The shoe repair shop man could not corroborate the defendant. Hendrickson testified he had gone there to get the shoes fixed but found they were not worth it and took no ticket for them.

Ten days or more after the fire, the overshoes found in possession of the defendant were sent to the Federal Bureau of Investigation in Washington for examination. An officer of that bureau testified there was a stain of human blood on one of the shoes but not enough to be classified or to compare with the sample of Hendrickson's blood which had been sent along. There was no evidence of blood on Hendrickson's clothing or gun, which had been sent to Washington also. The defendant testified he had stuck a barbed wire in his hand the afternoon of the fire, and that if there was any blood on his shoes or gun, it had come from his hand. He showed the scar to the jury.

It seems to us that this evidence tending to establish motive falls of its own weight. But if all the extreme implications of motive be accepted as true, they do not prove murder.

We have given a very extended review of the evidence. We think it justifies our conclusion of the insufficiency to take the case to the jury. We have carried along in the narrative the defendant's denials and explanations, which appear to be consistent and reasonable. But if they be entirely disregarded and the evidence of the Commonwealth relied upon as proof of murder alone be considered, it is not only consistent with the absence of a crime and with the accused's innocence of having any connection with the fire that destroyed the bodies of his sister and her husband. The only testimony tending to show that the deceased, Elmer Sevier, may have been murdered is that of Ewell Scott and Jim Sevier that during the late afternoon they heard a gunshot in the direction of his house. One said it was a muffled sound and the other clear. Only Scott heard a woman scream. It is noted there was only one shot fired, yet the remains of two bodies were found in the ashes. Can it be said that this bit of testimony is irreconcilable with innocence? Can it be said that the fact that the bodies of two

people were burned carries irreconcilable proof they were murdered by anybody? We think not. Scarcely is there a daily paper in which we do not read a record of such accidental tragedies.

In the complete absence of any evidence that the defendant murdered his brother-in-law, or indeed that he was murdered, we can account for the verdict only by the feeling that the evidence of the defendant's previous convictions in Harlan County in 1929 of voluntary manslaughter, see Hendrickson v. Commonwealth, 235 Ky. 462, 31 S. W. 2d 712, and in Letcher County in 1933 of an assault with intent to rob led the jury to believe that the suspicions in this case were well founded, and that it would be good for society to put the man away permanently. The local prosecuting officers must have recognized the weakness of the case else they would not have sought his indictment as an habitual criminal, for if guilty, it would have been of murder and nothing else, with the minimum penalty of life imprisonment, the same as that imposed upon one found to be an habitual criminal. The indictment was defective since it did not charge that one crime was committed after the conviction of the other, or in sequence, as held to be necessary in Denham v. Commonwealth, 311 Ky. 320, 224 S. W. 2d 180. The defendant had demurred to the indictment on this ground in the beginning, and had objected throughout the trial to evidence of the prior convictions. After it had all been let in, with what seems to us to be undue emphasis (by a number of witnesses under the guise of identification), the court ruled at the close of the evidence for the prosecution that the indictment was good as charging a second conviction but bad as to a third and required the Commonwealth to elect which of the former convictions should be submitted. It elected to rely upon the Harlan County conviction of voluntary manslaughter. The court admonished the jury that the evidence relating to it should not be received as substantive evidence on the charge of killing Sevier, and undertook to withdraw all the evidence relating to the conviction in Letcher County by telling the jury it was incompetent and not to consider it. The court having reached the proper conclusion of incompetency of the evidence under the defective indictment, pursued the course ordinarily deemed sufficient in such circumstances. However, it is quite fictional to say under almost any such

development that a jury does in fact disabuse their several minds of what they hear, notwithstanding the court's admonition. In the present case, it is apparent from the verdict that the jury did not steer clear of the prejudicial testimony they had heard. Being mortals, jurymen often succumb to the emotional factors—to the illegal, though not always illogical, view that a man who has been twice convicted of crime is probably guilty of that for which he is on trial before them. By reason of that badge of criminality, the prosecuting officers appear to have deemed suspicious many things they would otherwise have regarded as irrelevant circumstances, and the net of suspicion thrown around this man became a hangman's noose.

We, therefore, reverse the judgment because of insufficiency of evidence and guilt.

Judgment reversed.