## HENDRICKSON v. COMMONWEALTH.

Court of Appeals of Kentucky.

June 5, 1953.

'Hiram H. Owens, Barbourville, for appellant.

J. D. Buckman, Jr., Atty. Gen., Zeb A. Stewart, Asst. Atty. Gen., for appellee.

DUNCAN, Justice.

This appeal is from a conviction of willful murder in the alleged killing of Ethel Sevier. Although this is the first and only appeal of this case, a companion case involving a similar charge in the killing of Elmer Sevier was reversed by this Court in Hendrickson v. Commonwealth, 314 Ky. 464, 235 S.W.2d 981.

We are met at the outset with the assertion that we are controlled in the present appeal by our prior opinion inasmuch as the evidence was substantially the same in each case. Although we perceive a substantial difference, which we shall discuss as the opinion proceeds, we shall first consider the extent to which we may be bound by the former opinion in our consideration of the present appeal.

■ There is a vast difference between the law of the case rule and the doctrine of stare decisis. Under the former rule, it is stated generally that a court of review is precluded from reviewing questions which were propounded, considered, and decided on a previous review of the same case. The rule has been criticized and held inapplicable in certain instances by some courts upon the theory that where a case is reversed and remanded for a new trial, the whole action is tried anew and nothing is settled by the first appeal beyond the fact that the first trial was erroneous and all issues must be tried again. We are not concerned here with the reasons which prompt the criticism, because so far as we are concerned, we are not prepared to depart from or modify the rule to any extent.

■ The doctrine of stare decisis, stated in simple form and considered in relation to its effect upon private affairs, is nothing more than the application of the doctrine of estoppel to court decisions. Where courts have announced for the guidance and government of individuals and the public certain controlling principles of law, or have given a construction to statutes upon which individuals and the public have relied in making contracts, the general principles of estoppel would ordinarily preclude courts from overruling the principles which have been promulgated, thereby destroying contract and property rights which had been acquired on the faith and credit of former opinions. Where these considerations do not appear and the elements of judicial estoppel are not present, this Court has consistently refused to be limited by the ordinary requirements of the doctrine of stare decisis. Oliver Co. v. Louisville Realty Co., 156 Ky. 628, 161 S.W. 570, 51 L.R.A., N.S., 293.

■ It must necessarily be conceded that the law of the case rule is not involved on the present appeal. Although the same appellant is here, the offense is entirely separate and distinct from that which was the subject of the former appeal. Neither do we consider ourselves bound by the ordinary requirements of stare decisis since no contract or property rights were acquired or became fixed by the former opinion. In the interest of consistency, we consider the former record and the views there reached, but we refuse to restrict our present consideration to the single question of whether or not the evidence is substantially different on every feature of the case.

Although the evidence on both trials was similar in many respects, there is one significant and important difference. On the first appeal, it was held that there was not sufficient evidence to establish the corpus delicti. The body of Elmer Sevier was sufficiently identified in the first trial, but there was no evidence, direct or circumstantial, indicating that his death was the result of a criminal agency. In the present

case, the identity of the remains of Ethel Sevier was completely established, and it was shown from wounds in the chest wall, apparently inflicted with a sharp instrument, that her death resulted from a criminal act.

Although the salient facts have been stated in the prior opinion, we shall in the interest of convenience briefly repeat them here.

Prior to January 19, 1950, the appellant, his father, and an unmarried sister occupied a home on a small tract of land near the scene of this tragedy. Some weeks prior to the occasion in question, the father had gone to Bell County, where he remained. On January 17, 1950, appellant's sister, who was soon to become a mother, left the home and went with another sister to Knoxville, Tennessee, where she planned to remain through her confinement. This left appellant alone at his home.

Elmer Sevier and his wife, Ethel Sevier, the latter being appellant's sister, had no children and resided alone in a home located some five hundred yards from appellant's home. On January 19, 1950, Elmer Sevier and his wife visited at the home of his father and mother. They left the father's home around four o'clock in the afternoon, carrying certain articles of food and headed in the direction of their own home, which was a distance of a little more than a mile. So far as this record discloses, neither was again seen alive by anyone except appellant, who admits being at their home until about 6:15 p. m.

On the same night, at about midnight, the family of Delilah Mills noticed a light shining through a window of their home and saw the home of Elmer Sevier ablaze. Arthur Mills, son of Delilah Mills, immediately went to the nearby home of Jim Sevier, an uncle of Elmer, and informed him that Elmer's house was on fire. Arthur Mills, Jim Sevier, and Hubert Hodge, a son-in-law of Jim Sevier, then went to investigate the fire. Upon arriving at the scene, they observed that the house was completely destroyed, the roof and walls having fallen in. Inside they saw two burning bodies.

As we have previously indicated, the body of Elmer Sevier was so completely devoured by flames as to make it impossible to establish the cause of his death. The remains of the other body, identified as Ethel Sevier, bore mute evidence of the fact that death was attributable to other than natural or accidental cause.

Ewell Scott, who lived on a ridge about one hundred feet higher than Elmer's house and about five hundred yards away from it, testified that while on the outside of his home on January 19, 1950, at about "dusky dark" he heard a shotgun blast in the vicinity of Elmer's home and immediately thereafter he heard a woman scream. He stated that the scream lasted a short period of time, being loud at first and then becoming lower. Another witness who resided a greater distance from the Elmer Sevier home testified to hearing a shotgun blast but did not hear the scream.

Between seven and eight o'clock the same evening Tom Mills and Harvey Engle went to the Hendrickson home, where appellant was staying, to borrow some medicine. Mills testified that they knocked on the door for some time and after a delay of about ten minutes appellant came to the door and opened it, and that at the time he had his miner's cap on, lighted, and his shotgun in his hands. These parties spent a short time in the home and appellant was continually walking, nervously, from one room to another, loading and unloading his gun. They remained in appellant's home about thirty minutes and then left when appellant told them he didn't want to rush them off but he wanted to go hunting. Appellant admitted that Mills and Engle were at his home but denied that they had left at his request.

Jim Sevier and Hubert Hodge testified that around midnight when they were going to and returning from the fire they passed within fifteen or twenty feet of appellant's home; that there was a light in the home, and that the shades on the windows were pulled down. It was further testified that Jim Sevier called loudly to appellant about three or four times but received no answer and that someone was in the home because they were able to see a shadow of somebody

going to the back door and could hear someone walking inside. Appellant's testimony relative to this fact is that he was alone in his home and went to bed at approximately 8 p. m., and did not awaken until the county attorney and sheriff called upon him the following morning.

These officers, in their investigation of the fire, visited appellant's home on the morning of January 20 and found him there alone. They informed him that Elmer's home had burned, and he claimed to be completely unaware of that fact. They questioned him concerning the amount of money he possessed, and he disclosed that he had about $70. He explained that he obtained this money by doing various odd jobs and by borrowing about $20 of that amount from Elmer Sevier some few weeks before the fire. In connection with the possession of this money, it was shown that Elmer Sevier had approximately $75 a few days before the fire and that appellant within the preceding day or so had attempted to borrow $40 from Junior Scott. Appellant testified on the trial that he borrowed $20 from Elmer Sevier because he believed he would need it to pay the expenses of his pregnant sister. However, the county attorney testified that appellant's explanation on the morning after the fire was that he borrowed $20 from Elmer because he "wanted to know who my friends were." The same explanation was made with reference to his attempt to borrow the money from Junior Scott.

At the scene of the fire and within a few feet of the house, an empty 12-gauge shotgun shell was found. At appellant's home, the officers found a 12-gauge shotgun which had recently been fired. Appellant explained that on the previous day at about 4 p. m., he had fired the gun at some birds approximately one hundred or one hundred and fifty yards from Elmer's home. The fired shell was found much nearer the burned home than the point where appellant claimed to have fired his gun. The officers also found about six 16-gauge shotgun shells in appellant's home, and it was shown that two days before the fire some 16-gauge shells were on the mantel at Elmer's home. Appellant explained his possession of the 16-gauge shells by saying that he had purchased them in Corbin some two months previously; that he has asked for 12-gauge shells but was given 16-gauge shells by mistake and that the reason he did not exchange them for the number 12's was that he was able to use them in his 12-gauge shotgun. The officers took the appellant to the scene of the fire, and footprints which matched appellant's shoes were found about the home, near a chicken house and outside a window of the room in which the bodies were found. Appellant first insisted that he had not been near this window on his visit the previous evening, but after learning of the presence of the tracks admitted that he had been at that point.

About a week after the fire, Tom Sevier, Elmer's father, went to appellant's home and found some flour, shoes, and overshoes, which he identified as belonging to his son. A few days later, Don Young, a state police investigator, and several other officers visited appellant's home to inquire about these items. Mr. Young testified that appellant stated that Elmer gave him the flour. Appellant later insisted that he had traded Elmer some potatoes for the flour. Mr. Young also testified that appellant told him that he bought the shoes at Daniel's Department Store in Corbin on January 18, 1950, and the overshoes at Sears Army Store in Corbin on the same date. Appellant's testimony at the trial was that the shoes were paid for by his sister, the deceased Ethel Sevier, who bought them as a New Year's present to him.

Mr. Young further testified that he asked appellant what he did with his old shoes and he described a shoe repair shop in Corbin (Thurston's Shoe Repair Shop), where he stated he had left them to be repaired. Upon being asked for the claim ticket, appellant insisted that he did not receive a ticket because he concluded that the price of having the shoes repaired was more than they were worth and he did not intend to reclaim them. As soon as the officers left appellant's home, appellant went to Daniel's Department Store, Sears Army Store, and the shoe repair shop and attempted to have someone in each of the shops identify him as having been in the respective places of

business for the purposes indicated to the investigating officers. It was positively shown at the trial that appellant did not purchase the slippers at Daniel's Department Store, as the manager of the store testified that a complete record of each sale of shoes was kept and the records did not show any sale to appellant. It was further shown that the overshoes were not purchased at Sears Army Store, as they did not handle that brand. The shoe repair shop was unable to locate any shoes which had been left by appellant. It was shown that a sale of slippers of the exact brand and style of those found in appellant's home was made to Elmer Sevier by Daniel's Department Store in December, 1949.

The overshoes, admittedly worn by the appellant on the night of the fire were submitted to the F. B. I. laboratory for analysis of stains appearing thereon. A special agent of the F. B. I., whose qualifications are completely established, testified that he had made an analysis of the stains and found that they were made by human blood. Appellant's explanation for the presence of the blood on his overshoes was that he had cut his hand on a barbed wire fence the day the fire occurred.

Summarizing the evidence, we point to the following facts which appear to unerringly establish appellant's guilt: (1) his presence at the home of the deceased on the evening of the fire; (2) his possession after the fire of articles which came from the home of the deceased; (3) his possession of a sum of money substantially corresponding with the amount which Elmer Sevier was known to have had, with his unreasonable explanation of the manner in which the money was acquired; (4) human blood upon his clothing; (5) his strange and unexplainable conduct at his home in the presence of Tom Mills and Harvey Engle between seven and eight o'clock on the evening of the fire; (6) the fact that someone was up and moving about inside appellant's home at the very hour that the Sevier home was burning; and (7) appellant's false statements to the investigating officers, many of which were contradicted by his own testimony at the trial, and other statements overwhelmingly branded as false by other testimony.

Any of these facts, standing alone, might be insufficient to connect appellant with this offense. However, they constitute a chain of circumstances which must be considered collectively.

In order to sustain a conviction in a criminal case, where the evidence is either direct or circumstantial, it is not necessary that the evidence should exclude every possibility of a defendant's innocence. It is sufficient if all of the circumstances when considered together point unerringly to his guilt. In the case of Taylor v. Commonwealth, 293 Ky. 823, 170 S.W.2d 903, 907, it was said:

"Such well established circumstances point unerringly to his guilt, although it might not be sufficient to exclude the possibility of defendant's innocence, but which may be said with reference to all contested issues arising in all sorts of litigations. Therefore, in cases like this one, each case must rest upon its own facts, and when they are such that a jury would be authorized under the law, applicable to the particular character of case, to find against the defendant, this court is without authority to reject its finding."

We think the evidence was sufficient in this case to justify a submission to the jury on the question of appellant's guilt or innocence.

As a second ground for reversal, appellant insists that there was a separation of the jury in violation of Section 244 of the Criminal Code of Practice.

The undisputed affidavits of the deputy sheriff, the manager of the hotel, and members of the jury disclose that the jurors were kept overnight in six separate rooms on the third floor of a hotel. The hallway leading into the rooms was in an L shape, and the deputy sheriff was at one end of the L farthest from the stairway. Each room was locked, and the manager of the hotel remained in the lobby all night. The only entrance to the third floor was by a stairway commencing in the lobby, and no per-

son went up the stairway after the jury retired. At least every hour and fifteen minutes during the night the manager, in addition to watching the stairway from the lobby, made an inspection of the hallway on the third floor and observed no person in or about the hallway. The deputy sheriff was up from time to time and examined the doors of the jurors' rooms. The affidavits show an absolute impossibility for any contact between members of the jury and other persons. Under the circumstances, we do not think there was a separation within the meaning of Section 244 of the Criminal Code of Practice. Wilson v. Commonwealth, 243 Ky. 33, 48 S.W.2d 3; Adkins v. Commonwealth, 197 Ky. 385, 247 S.W. 26.

The judgment is affirmed.